# SUPPLEMENT.

## MARY S. JACKSON *vs.* THE BOSTON AND WORCESTER RAILROAD CORPORATION.

[The opinion of the court, in this cause, having been frequently referred to by counsel, and also by the court (see 1 Met. 99, and 6 Met. 447), has been thought worthy of preservation in an authentic and accessible form. The decision took place at the March term, 1837, for Suffolk. The circumstances, which prevented the case from being reported and published, by the then reporter, Mr. Pickering, in the regular series of reports, are probably stated in the following remarks of WILDE, J., when referring to it, in giving the opinion of the court in the case of *Sparhawk* v. *Bullard,* 1 Met. 95, 99.

" This claim, it is contended, is sustained by the opinion of the court, in the case of *Mary S. Jackson* v. *The Boston & Worcester Railroad Corporation,* which depended on the same title. But that opinion was founded on a misapprehension of some of the facts, which have been satisfactorily proved in the present case. One of the deeds, under which the tenants claimed in that case, was not produced; and the opinion of the court was predicated on the supposition, that the tenants had not traced back their title to Colbron's heirs. But this supposed defect in the evidence was supplied, and the tenants' title under those heirs was made to appear, on an application by the tenants' counsel to stay the judgment, which was stayed accordingly."]

THE facts appear to be sufficiently stated in the opinion.

WILDE, J. The decision of this cause has been delayed under the expectation that the argument of another cause pending might throw some light upon the original titles of the parties, and the first location of the flats demanded. But as this case must be decided upon the facts reported, and as the parties have not traced back their titles to the original proprietors, we see no good reason for suspending judgment any longer. The question is, which of the parties has shown the elder and better title, for it may be, that neither party has a perfect indefeasible title. Yet if the demandant has shown an elder and better title than the tenants, she is entitled to judgment, although she may

perhaps be hereafter dispossessed by the true owner. If A enters on the land of B and takes possession, and afterwards C enters on A and dispossesses him, A may well maintain an action against C to recover possession, although his entry on B was without right and tortious; for mere possession is a good title against a stranger having no title. It is true that a party cannot acquire a title by a tortious entry, but if he be suffered to retain possession undisturbed by the owner, he cannot lawfully be disturbed by a stranger; and by such a possession he may eventually acquire a perfect title. In the present case each party relies on a possessory title thus acquired.

It was proved at the trial, on the part of the demandant, that in 1763, one Elizabeth Glover conveyed to Joseph Jackson, the demandant's grandfather, a lot of land above the flats demanded, extending from Orange Street, now Washington Street, westerly to high water mark, together with all the flats below said high water mark belonging to said granted premises.

Joseph Jackson entered into possession of the premises and became seized of the whole, although there was no proof of any particular acts of ownership or possession of the flats. For when a man enters on land, claiming a right or title to the same, and acquires a seizin by his entry, his seizin shall extend to the whole parcel to which he has right; for in this case an entry on part is an entry on the whole. *Kennebeck Purchase* v. *Springer*, 4 Mass. 418. And, upon the same principle, if a feoffment be made of divers parcels of land in the same county, livery of seizin of one parcel in the name of the whole would confer a seizin of all the parcels, unless they were held at the time by adverse possession. Stearns, 382.

Joseph Jackson, therefore, had a good right to enter, under his deed from Elizabeth Glover, and to take possession of the granted premises. He had a title to the flats, and whether any other person had or had not a better title is immaterial, as the tenants do not claim under any one who at the

time had any title or claim to these flats, as will appear hereafter.

It appears that Joseph Jackson continued in possession until 1793, when he died, after having devised his real estate to his son Johnson Jackson, who entered thereon under the will and enjoyed the same till his decease in 1824, but there is no proof of any particular acts of ownership or possession of the flats by said devisee.

It is admitted that the demandant is one of the children and heirs of Johnson Jackson, and thus she proves a possessory title to the premises which has been undisturbed, until within a few years, ever since 1763.

This would be a perfect title, if the possession had been such as to raise the presumption that the former owner had knowledge that the claim was adverse and that his seizin had been interrupted. But this notice is not necessary; the adverse party does not claim under a prior title or possession. Where both parties claim under titles commencing by possession, the elder possession must prevail, unless it be afterwards defeated by such a possession of the adverse party as would constitute a disseizin. The person first in possession is presumed to have the right, and the entry of any one afterwards without right is a tortious entry.

But it has been argued by the counsel for the tenants, that there is no sufficient evidence to prove that the flats demanded of right belonged to the demandant's lot: and if so, undoubtedly the demandant's title fails.

We are however of opinion that the evidence clearly proves that the demandant's lot was laid out, extending from Orange Street to low water mark, so as to include the flats in dispute.

Previous to the year 1662, one William Colbron was seized of a large estate, including the demandant's lot, with the flats below; and there is no doubt that his title was a valid one, as no older title has been shown; and we understand that both parties claim to hold under titles derived from him. He died in 1662, after having devised three eighths of his estate to

his daughter, Elizabeth Payne, and her children and their heirs. In 1697, by a deed of partition the shares of these children were divided and set off to each in severalty. The first lot was set off to William Payne, bounded south by the Neck, east by Orange Street, west by the sea, and north by land of Thomas Powell and Margaret his wife, one of the sisters of said Payne and a granddaughter of the said Colbron. This lot, it appears, was laid out on the south side of Colbron's estate, and was afterwards bounded by Castle Street, which, as appears by the deeds in the case, was laid out between the years 1708 and 1714, probably in 1709. For in 1708 Payne conveyed this lot to Daniel Epes, bounding it southerly on the Common ; and in 1714 Daniel Epes conveyed the same to Silence Allen, bounding it by the new highway, or land of Stephen Minot, and by the partition deed between Samuel Phillips and others, it appears that a lot southerly of and adjoining to the new highway called Castle Street was laid out to Stephen Minot, and it is recited in that deed of partition, that the land thereby divided was bounded northerly by Daniel Epes on the westerly side of Orange Street.

Payne's lot, therefore, is clearly located next adjoining Castle Street, and extends from Orange Street westerly to the sea, which clearly includes the flats to low water mark ; otherwise the lot would at no time be bounded by the sea except at high water mark, and this would be inconsistent with the obvious meaning of the words of description.

The next lot northerly of William Payne's lot was set off to Thomas Powell and his wife Margaret, and was bounded south by William Payne, east by the said highway or Orange Street, north by a lot set off to Thomas Walker and Rebecca his wife, another sister of said Payne, and westerly by the sea ; and the next lot northerly was set off in severalty to said Thomas Walker and his wife, bounded also westerly by the sea. Several other lots were likewise assigned in severalty to the parties to said deed of division, the bounds of which are not material in the decision of this cause. By this division,

the flats in front of the three lots first above mentioned were all divided between the several parties in severalty. How the residue of Colbron's estate was divided between the other devisees under his will, does not appear ; but the presumption is that it was in no respect inconsistent with the above mentioned division between the heirs of Elizabeth Payne.

The demandant claims to hold under a title derived from Thomas Powell and wife.

They by their deed, dated April 15th, 1703, conveyed the lot assigned to them in the before mentioned division to John Clough, bounded easterly on the way leading to Roxbury, (Orange Street,) southerly upon the land of William Payne, and at the rear of the westerly end by the flats, and northerly by land of Thomas Walker.

It is contended by the tenants, that by this description the flats were excluded, and generally there is no doubt that a lot bounded by flats would be construed so as to exclude the flats ; but in construing a deed all the language of its various parts is to be regarded, and if any be apparently inconsistent, they are to be reconciled, if they may be by any reasonable construction. Now, as it appears by the language of the deed that the whole lot was intended to be conveyed, and as it is bounded by the rear of the lot of the westerly end, it does not seem to be a strained construction to hold that the flats passed by the deed. But it is not necessary to decide this question, as the flats belong to the heirs of Powell and wife if they did not pass by the deed to Clough ; and as the tenants show no title derived from them, they cannot set up their title, (especially one so ancient and so long dormant), to defeat the title since acquired by the demandant and those under whom she claims. John Clough continued to hold the lot until April, 1741, when he conveyed the same to his daughter Elizabeth Glover, who afterwards conveyed it to Joseph Jackson, the demandant's ancestor.

The description of the lot in this deed is substantially the same as that contained in the deed from Powell and wife to

John Clough; but this was a conveyance of a messuage with the appurtenances, and as the flats below belonged to their lot by the division between the children of Elizabeth Payne, they passed to Elizabeth Glover as appurtenant to the lot.

For although land cannot pass as appurtenant to land, it may pass as appurtenant to a messuage. *Doane* v. *Broad Street Association*, 6 Mass. 332.

Thus it appears that the demandant has shown a good and perfect title to the lot assigned to Powell and his wife above high water mark, and a connected and continued possessory title to the flats below, claimed as belonging to that lot, ever since the year 1741. These flats were located as part and parcel of the lot assigned to Powell and wife in 1697.

This possessory title is good and valid against all persons not claiming under Powell and wife, unless they can show that that division was not valid, and that they have a better title under some one of the heirs or devisees of Colbron; or that they derive a title from some proprietor who was seized and possessed previous to the seizin and possession of Colbron; or had a better title than he had.

And this the tenants have failed to show.

The title conveyed to the tenants by Francis C. Lowell is not traced back to the heirs or devisees of Colbron, nor does it appear what flats, if any, were included in his lot.

This lot, in 1780, was conveyed by one Nathaniel Sparhawk to Joshua Farrington. In 1785, Joshua Farrington conveyed the same lot to Edward Tuckerman, who, in 1791, conveyed to Christopher Minot; but in all these conveyances the lot is bounded westerly on the beach; so that, by this description, the flats seem to be excluded. It is true that the flats might pass as appurtenant to the lot conveyed, if it were shown that the flats below were included in the original location of the lot. But this does not appear by any evidence in the case.

In 1807, Christopher Minot conveyed the lot he purchased of Edward Tuckerman by a deed of warranty to Isaac P. Davis, bounded westerly on the flats; and by another deed

released his title to the flats below. What his title was does not appear, but the form of conveyance indicates a doubt as to its validity.

In 1821, Isaac P. Davis conveyed his title to Francis C. Lowell. This title, thus derived, cannot certainly prevail against the elder title of the demandant.

As to the other deeds put into the case, by the tenants, no particular remarks seem necessary. They are all subsequent to the death of Colbron in 1662.

He therefore must be considered the lawful proprietor of the flats demanded, and of other flats to a considerable extent northerly.

How all the flats were divided between the several devisees under his will, has not been shown by either of the parties.

But the demandant has shown that the southerly part of the flats, including the flats demanded, were divided between the children of Elizabeth Payne; and, as before observed, the presumption is, nothing appearing in evidence to the contrary, that the flats northerly were divided between the other devisees. The fact may be otherwise; but if so, it is incumbent on the tenants to show it.

It has been argued that the flats belonging to Colbron's estate ought to be so divided as to allow to each party holding und r his title his proper and proportional share of the flats. This argument might perhaps be well founded, if the whole division of that estate had been shown; but I think it manifest, by the inspection of the map, that if such a division were to be made, no part of the flats demanded would be included within the Lowell lot.

But the argument cannot be maintained upon the facts reported.

We have no knowledge how the flats were divided, except between the children of Elizabeth Payne.

They might have had assigned to them, in the general division of the estate between the devisees under Colbron's will, a larger share of the flats and a less proportion of upland than the other devisees, or it may have been otherwise.

49 *

The presumption is that the division between the children of Elizabeth Payne was correctly made, and upon the facts reported it cannot be disturbed by the tenants.

The conclusion is that the demandant, having shown an elder and better title than the one shown by the tenants, is entitled to judgment ; saving, however, to the latter the right of having the value of the betterments or improvements made by them ascertained, as provided in the report of the case.