UNITED STATES of America, Plaintiff,

v.

CERTAIN LAND LOCATED IN the COUNTY OF BARNSTABLE, The Commonwealth of Massachusetts, E. Bennett Beede et al., Defendants.

Civ. A. No. 67–988–C.

United States District Court,
D. Massachusetts.

June 13, 1980.

Edward F. Harrington, U. S. Atty., Kenneth Nasif, Asst. U. S. Atty., Boston, Mass., for plaintiff, U. S. Govt.

Philip R. White, Jr., William P. Homans, Boston, Mass., for defendants.

## JUDGMENT

CAFFREY, Chief Judge.

In accordance with opinion filed this date, it is the judgment of this court that:

1. At the time the declaration of taking was filed herein, title to tract no. 8–P–1036 in its entirety was vested in fee simple in E. Bennett Beede, Jefts G. Beede and Deborah S. Phillips.

2. Neither Dorothy Fearing, her husband, nor Andrew D. Fuller, Jr. have acquired by adverse possession title to any land contained within tract no. 8–P–1036.

3. Mr. Fuller is the owner of a shack located within the tract which he is free to remove at his own expense.

4. The claim of the so-called Ford interest is dismissed.

5. Any motions seeking relief inconsistent with the above four paragraphs are denied.

## OPINION

CAFFREY, Chief Judge.

On December 29, 1967 the United States filed a complaint and a declaration of taking for tract No. 8–P–1036 which consists of approximately 251 acres of land located in Provincetown, Massachusetts on the so-called Provincetown Great Beach. The taking was made for the purpose of including this land in the Cape Cod National Seashore Park. A cash deposit of $117,900.00 was paid into the registry of this court and the late Judge Francis J. W. Ford, to whom the case was originally assigned, ordered that the money be placed in an interest bearing account for the benefit of the United States. As of January 16, 1980 the balance of that account was $205,300. The case passed through the hands of several other members of the court and eventually was assigned to the undersigned for trial. As part of the trial the court took a view of the premises and spent several hours examining same accompanied by counsel for all parties still actively asserting a claim of any type in connection with the case.

The file discloses that the United States filed a motion on August 3, 1971 for an order to show cause why a ruling should not be entered finding that good title in fee simple to the entire tract is in E. Bennett Beede, Jefts Beede, and the heirs of Deborah S. Phillips. Counsel for the Beede interests filed a petition for determination of title and distribution of funds on January 30, 1978 and on March 7, 1980 an opposition to the Beede's petition was filed by Andrew Fuller.

An examination of the documents in evidence and the premises themselves establish that over the years ten small shacks, and the word "shacks" is meant in its most literal sense, were constructed on the locus. Those shacks, formerly owned by a person named Wells and a person named Ford, have been destroyed. The United States has reached an agreement of some type with the owners of all presently existing shacks other than Mr. Fuller, i. e., in 1973 it gave shack owner Werner a lease for the remainder of his life; in 1973 it gave life occupancy agreements to shack owners Margo, Chanel and Fowler; in 1980 the government entered into 25-year occupancy agreements with shack owners Tasha and Ofsevit; a claim on behalf of shack owner Wells, whose shack was destroyed, was withdrawn; the remaining shack owner, other than Mr. Fuller, was named Ford. The Ford shack was destroyed by fire and although a claim was filed herein on behalf of the Ford interests, no evidence was tendered in support of that claim and I rule that the Ford claim should be dismissed.

There remains for decision the claim by the Beede interests that they hold title to the entire tract in fee simple and the claim advanced by Mr. Fuller that he owns his shack and an area of approximately 8 acres surrounding same by virtue of adverse possession by his predecessor in title, Mrs. Dorothy Fearing plus his own continued occupancy subsequent to his purchasing the shack from Mrs. Fearing.

At the trial approximately 70 documents were introduced into evidence. They include deeds of varying degrees of antiquity, declarations of trust, a variety of probate court documents, geological survey charts, surveyors sketches and plans, photographs and miscellaneous other documents. The oldest document in evidence (Exhibit F) has a reference to the date June 14, 1719 but it is not clear whether this is the date of the actual execution of this ancient and semi-legible record of the division of land. The more important deeds were executed in May 1860, May 1864, April 1901, and December 1902. At the trial both the Beede interests and Mr. Fuller called as witnesses attorneys who qualified as experts in real estate practice. The expert witness called by Mr. Fuller conceded that the Beedes have a good paper title to the property from the time of the execution of Exhibit 2, i. e., from December 3, 1902 to date. This concession was based on a large number of exhibits consisting of deeds, declarations of trust, and various probate court documents admitted into evidence establishing the owners of title of the land in question from 1902 to date. Defendants' expert challenged the fact that the settlor of the trust declaration in Exhibit 2 had good fee title to the entire locus.

The controversy between the Beedes and Fuller revolves around the location of the northern boundary of the premises. The Beede's claim title to a tract which originally ran from Provincetown Harbor on the South to the Atlantic Ocean on the North. The disagreement specifically concerns the proper construction of the phrase "hollow of the beach" in Exhibit 1 and Exhibit 2. The Beedes contend, and their expert testified, that the hollow of the beach means a point between the mean high water mark and the mean low water mark. Fuller contends that the phrase "hollow of the beach" refers to a valley between two irregularly shaped sand dunes which are located some 700–900 feet more or less away from the mean high water mark.

■ After two days of trial, the court, with all counsel spent approximately two hours traversing the area in question on foot and in a four-wheel drive Cherokee Scout vehicle made available by the Nation-

al Park Service. This view established that the locus is made up primarily of very large sand dunes covered mostly by beach grass and some scrubby vegetation such as wild roses, beach plums, berries, and poison ivy. The only structures on the 251 acres are the eight surviving shacks, none of which, and particularly the Fuller shack, appear to have gas, electricity, telephone, indoor running water, indoor plumbing or town sewerage. The dunes are not uniform in configuration and are of varying widths and depths. There is presently, however, one low area between two groups of dunes where there is some vegetation growing and this area appears from a geological survey map, to be the lowest point in the entire tract. It is this area that Mr. Fuller claims should be found by the court to be the "hollow of the beach" referred to in the ancient deeds. I decline to so find for a variety of reasons.

One of the reasons is that, in my opinion, the deeds make it clear that Beede's predecessor in title was the grantee in an instrument which intended to convey land running from the seashore (the harbor) to the seashore (the Atlantic Ocean). I have reference to Exhibits 1, 16 and 17, and the testimony of Beede's expert which I believe. I also have in mind that the critical deed executed in 1860 was executed 120 years ago and that it is a matter of common knowledge that sand dunes shift around as years go by and there was no evidence, nor could there be any, that the low spot presently between the two amorphous groups of dunes was in existence or even a low spot 120 years ago. There likewise was a dearth of evidence as to what persons who were alive in 1860 meant by the phrase "hollow of the beach" and counsel were unable to produce any documents, much less any witness, who could cast light on this question.

As a matter of plain common sense, in the absence of such evidence I think it extremely unlikely that anyone using English in its normal manner would characterize a location approximately 700–900 feet away from the high water mark as the "hollow of the beach" or any other part of the beach. It is this court's experience, including about 60 years living on a New England beach at the ocean's edge, that the word beach generally is applied to areas between the low water mark and the start of witch grass or eelgrass which usually grows within 100 feet of the high water mark. I am prepared to and do find as factual the opinion expressed by Beede's expert that the measurement of 3,595 feet in Exhibits 1 and 2 was an erroneous figure. It should be noted that Exhibits 1 and 2 use an identical metes and bounds description for the tract in question and that both excluded the same 23 parcels which had been previously sold by the grantor in Exhibit 1 or his predecessors in title.

Exhibit 2 specifically refers to "all the land extending from seashore on the Harbor side to the seashore on the north of said town." I draw the inference that since the metes and bounds description in Exhibits 1 and 2 were identical, that each document specifically excluded the same previously sold 23 parcels, that the two documents were intended to describe, and did describe, the same tract of land, and I further infer that the phrase "all the land extending from the seashore on the Harbor side to the seashore on the north of said town," contained expressly in the declaration of trust which is Exhibit 2 is equally applicable to the deed from the heirs of Perez Bangs to Nathaniel B. Fisk which is Exhibit 1. Additional factors which are part of the record of this case and which in my judgment support, if not mandate, the drawing of this inference are:

1. The Town of Provincetown billed the Beedes for taxes on the tract and all the shacks at least from 1945 through 1968 as is evidenced by tax bills admitted into evidence.

2. Andrew Fuller himself in 1956 went to Mr. Beede's home and orally attempted to negotiate with Mr. Beede for the purchase of some land in the area where the shacks are located and in 1963, through the law firm of Hale & Dorr, Mr. Fuller again attempted to purchase a piece of this land from Mr. Beede.

3. Mrs. Fearing, Fuller's immediate predecessor in occupancy of the shack, stated she believed, and it was generally believed by the persons in the area, that the land belonged to the Beedes.

4. Government Exhibit A, a preliminary certificate and binder issued by the Home Title Guaranty Company, amounts to expert opinion that after a title search that company believes that the Beede's own the land in fee simple, a title which Home Guaranty is prepared to insure. This opinion is corroborative of the opinion expressed by the Beede's expert and the other findings by this court.

5. Mr. Fuller's real estate expert testified that he found no evidence of title in anyone other than the Beedes in any search he ever made at the registry of deeds and the probate court. This expert conceded that he found no record title to the land at issue in either Mr. Fuller, Mrs. Fearing or Ann Kleinman. He went on to express the opinion that "no one" owned the land between the ocean and the point 900 feet away which Mr. Fuller claims is the "hollow of the beach." I find his opinion that no one owns that land to be afactual, preposterous, and incredible.

■ On the basis of the above and the documentation and testimony in the case generally, I rule that an order should enter declaring the Beedes to be seised and possessed of a good title to the entire tract in fee simple.

■ With reference to Mr. Fuller's claim to ownership of the shack and approximately 8 acres of land surrounding the shack on the basis of adverse possession, it must first be noted that Mr. Fuller did not acquire the shack from the Fearings until about two years after the government had filed the declaration of taking. As a consequence of this, Mr. Fuller's claim of title by adverse possession is completely dependent on adverse possession having been acquired by the Fearings.

■ A review of the testimony of Mrs. Fearing, a widow, who was called as a witness by Mr. Fuller completely negates any acquisition of title to land by the Fearings via the adverse possession route. Mrs. Fearing testified that under date of November 25, 1939 she received a document from Ann Kleinman which document was admitted into evidence as Exhibit K. Exhibit K purports to "grant, sell, transfer and deliver unto the said Dorothy Fearing the following *goods* and *chattels*," (emphasis added). It then proceeds to describe a building "together with whatever rights in the land and beach on which the said building sets that I may have, if any." Thereafter three additional paragraphs refer to the sale of goods and chattels, and no other mention is made of land. I rule that this document is a bill of sale of the shack and its contents and that it conveys no interest of any kind in any real estate. It should be noted that there is nothing in the record of this case as to the length of time Miss Kleinman owned the shack nor is there any evidence of her acting adversely in any way, shape, or manner to the interest of the true owner of the land.

Mr. Fuller's real estate expert conceded that Exhibit K conveyed no interest in real estate and he further conceded that Exhibit L, a purported deed executed by Mrs. Fearing to Mr. Fuller, is "not valid" because Exhibit L depends on Exhibit K as its source of title. Mrs. Fearing further testified that starting in the summer of 1940 she and her late husband regularly occupied the shack from about the end of June until Labor Day. She testified that she got water by walking down the dune to a pump about 50 feet away from the shack and that others could use it. She testified that the Fowlers put a fence around their shack about 1951 and that a road, which lay between the Fowler's fence and her shack, was used by the public and taxis coming out of Provincetown, and that this use continued from 1951 through 1967. She testified that she and her husband never erected a fence of any kind, that they usually allowed people to come and go around the shack and all the land contiguous thereto, that she and her husband never posted a sign such as "keep out" or "private property", and that

they did nothing if a stranger drove a vehicle close to her shack. She conceded that she bought only a building from Ann Kleinman and that people other than members of her family came on the land freely, and wandered around where cranberries, blueberries and beach plums grew. She testified that nobody stopped anybody. Mrs. Fearing testified that she paid taxes on the shack but not on the land. In answer to a question "You felt you were occupying that area out there sort of at sufferance?" She answered, "yes probably." She conceded that she and her husband never attempted to restrain anyone from walking in the immediate area thereof, and she also testified that she and her husband figured that someone else owned the land and that the rumored owner was Mr. Beede. She specifically testified that it was generally understood and rumored that the Beedes owned all the land and as far as she knew "we did not own it."

Mr. E. Bennett Beede, a 67 year old graduate of MIT, testified that he and other members of his family have used the locus since about 1914. He testified that since that time the land has always been wide open and that the shack owners were recognized by his parents, himself, and his siblings as "sojourners." He testified that the shack occupiers were there by permission and that his father before him, as well as he and his siblings, have paid taxes on both the land and the shacks as far back as he could remember. Mr. Beede testified that those tax bills referred to the land between the former Old Colony Railroad on the south and the Atlantic Ocean on the north. He specifically testified that the Fearings were permitted to use the premises and the area, that he and his family knew who the shack owners were, and that the shack owners knew the Beedes were aware of their use of the shack.

■ On the basis of the foregoing, I rule that Mr. Fuller has failed to show that the Fearings acquired a good title by adverse possession, and that he has failed to show actual open, exclusive, and hostile possession by the Fearings. *See Ottavia v. Savarese*, 338 Mass. 330, 334, 155 N.E.2d 432 (1959); and *Cook v. Babcock*, 11 Cush. 206, 209 (1853). Consequently, I rule that Mr. Fuller has no title to any land on the locus and owns only the shack itself.

Order accordingly.