674 F.2d 90
 UNITED STATES of America, Appellee,
v.
CERTAIN LAND LOCATED IN the COUNTY OF BARNSTABLE,
COMMONWEALTH OF MASSACHUSETTS, E. Bennett Beede,
et al., Defendants, Appellees.
Grace Bessay, Executrix of the Estate of Andrew D. Fuller,
Jr., Defendant, Appellant.
 Nos. 80-1462, 80-1633.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 8, 1982.
Decided March 19, 1982.
 
 William P. Homans, Jr., Boston, Mass., with whom Homans, Hamilton, Dahmen & Marshall, Boston, Mass., was on brief, for appellant.
 Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., with whom William F. Weld, U. S. Atty., Boston, Mass., Anthony C. Liotta, Deputy Asst. Atty. Gen., Washington, D. C., Kenneth P. Nasif, Asst. U. S. Atty., Boston, Mass., and Anne S. Almy, Atty. Dept. of Justice, Washington, D. C., were on brief, for appellee, United States of America.
 Philip R. White, Jr., Boston, Mass., with whom Hutchins & Wheeler, Boston, Mass., was on brief, for appellees E. Bennett Beede, et al.
 Before ALDRICH and CAMPBELL, Circuit Judges, TORRUELLA, District Judge.*
 BAILEY ALDRICH, Senior Circuit Judge.
 
 
 1
 Pursuant to the Cape Cod National Seashore Act, 16 U.S.C. §§ 459b to 459b-8, the government took a sizable portion of outer Cape Cod, Massachusetts, for a park, procedurally by filing a declaration of taking in the district court and depositing substantial sums to be paid to whomever may be entitled. The segment presently concerned, hereinafter the locus, lies between Provincetown and Truro and extends, shore to shore, from Provincetown Harbor on the south, to the Atlantic Ocean on the north. On the north portion, but not at the water's edge, are scattered a number of structures, locally known as shacks, occupied, from time to time, by summer residents. The rest of the locus is bare. Most consists of sand, with beach grass, and occasional low growth. Ownership of the entire 251 acres is claimed, jointly, by the Beedes, appellees herein. An eight acre portion of the locus under and surrounding one of the shacks, hereinafter the lot, or the Fearing lot, is claimed by Bessay, executrix of Fuller, assignee of Fearing, a long-time occupant of the shack and original claimant at the time of the taking. After trial without jury, actively participated in by the government although claiming to be an amicus,[1] the court found that the Beedes were, prior to the taking, vested in fee simple of the entire locus, and that Fuller, the then party, had failed to prove that Fearing, who admittedly did not have record title, had acquired title to any part of the locus by adverse possession. United States v. Certain Land Located in the County of Barnstable, 1980, 491 F.Supp. 1252, hereinafter Certain Land. Bessay appeals.
 
 
 2
 Although, in a sense, the question of record title is secondary to the ultimate issue, we agree with the court's treating it first because of its possible bearing. The court put the question,
 
 
 3
 "The disagreement specifically concerns the proper construction of the phrase 'hollow of the beach' in Exhibit 1 and Exhibit 2." Certain Land, ante, at 1254.
 
 
 4
 Exhibit 1 is a deed dated December 3, 1902 to one Fisk. Exhibit 2, of the same date, is a deed from Fisk, to a trustee, of ostensibly the same land. It was agreed that the Beedes were the trustee's successors in title. Both deeds described their northern boundary as "the hollow of the beach so called." The issue is whether this was a term approximating seashore, as the Beedes' expert, Markson, testified, or was a valley several hundred feet back, and hence south of the Fearing lot, where Bessay's expert placed it.
 
 
 5
 Markson's entire testimony on this question was as follows.
 
 
 6
 "(I)t is generally felt, or it is generally conceded, from a conveyancing point of view, that the term 'beach' includes the land which is between high and low water mark; therefore, it seems to me that the term 'hollow of the beach' probably refers to some monument which occurs between high and low water marks. So, in fact, even if the description does not carry all the way down to the low water mark, it certainly includes to some monument-whatever it may be-that is, something below high water mark, which would, therefore, be presumably under water during high tide."
 
 
 7
 Markson had never seen the phrase before, and gave no further ground for his opinion, either lex or lexicon derived. By way of anticipation, we note that he, unlike the court, based his opinion that the Beedes had title to the entire locus essentially on this definition, and not on another portion of Exhibit 2, not found in Exhibit 1.[2]
 
 
 8
 Bessay's expert, Cantwell, testified at some length that the "hollow of the beach" was a dry valley, described by the court as a result of a view,[3] lying between two large dunes, which he stated to be a continuation of the "race run" of the tidal water running in and out of Provincetown. This valley runs somewhat parallel to the ocean on the north side of the Cape, but lies several hundred feet inland.
 
 
 9
 In finding that it believed the Beedes' expert's definition, the court gave several reasons, none of which we can accept. One was that "it is a matter of common knowledge that sand dunes shift around as years go by and there is no evidence, nor could there be any, that the low spot presently between the two amorphous groups of dunes was in existence or even a low spot 120 years ago." Amorphous, or no, does not mean that dunes and valleys did not exist at all, so that the parties must have intended the shore line. Courts recognize movable boundaries. E.g., Percival v. Chase, 1903, 182 Mass. 371, 378, 65 N.E. 800.
 
 
 10
 Next, the court said that as a matter of plain common sense to one who had lived on a New England beach, it is
 
 
 11
 "extremely unlikely that anyone using English in its normal manner would characterize a location approximately 700-900 feet away from the high water mark as the 'hollow of the beach' or any other part of the beach." Certain Land, ante, at 1255.
 
 
 12
 The first answer to this is that the court overlooked the government's opening, in which counsel stated that the entire 251 acres of land involved in the taking was "a section called 'Great Beach.' " Alternatively, although the matter apparently did not surface, a note in the 1715 Proprietors' division states that the area to the north, then known as Eastern Harbor Great Beach, "was at least 3/4 mile wide from the ocean." Either way the "beach" extended far inland of where Cantwell located the hollow. We cannot accept taking judicial notice that a part of an extensive area described as a great beach should not be known as the hollow of the beach.
 
 
 13
 The more basic error, however, is that it was improper procedure to interpret a phrase of six words by defining one of them (beach), making a guess as to another two (hollow of), and omitting the last two altogether. The full phrase was "hollow of the beach so called." Every word, presumptively, has meaning. The most apparent meaning of "so called" is to suggest something special, or idiosyncratic. It would be an appropriate label, for example, if the word "beach" were being used with other than the court's normal meaning. As to what was suggested by "hollow," the Beedes' witness, instead of, for all that appeared, drawing a probable meaning out of the air, might better have consulted the dictionary. "Hollow," inter alia, means "a low spot surrounded by elevations; a small valley." Webster's New Int. Dict. (3d ed.). Cantwell, precisely. Markson's opinion was valueless.[4]
 
 
 14
 We remark, also, that Markson should have noted that, when used in Exhibits 1 and 2, the full clause read, "an iron post in the hollow of the beach so called." A half tide point in the beach would be a singular place to establish a permanent monument-how long would an iron post "presumably under water during high tide," remain on a sand beach on the Atlantic side of Cape Cod? Further, the boundary was stated as "following the hollow" of the beach thereafter. What grantor would wish to reserve a small strip, below the mid-tide line of a beach, and what grantee would permit it? See Anderson v. DeVries, 1950, 326 Mass. 127, 133-34, 93 N.E.2d 251. Yet some meaning must be given to "hollow." An iron post in a dry valley, the boundary thereafter to follow the valley, makes sense. Markson's definition was not only inadequately arrived at, it made none.
 
 
 15
 The court's third reason for accepting Markson was,
 
 
 16
 "There ... was a dearth of evidence as to what persons who were alive in 1860 meant by the phrase 'hollow of the beach' and counsel were unable to produce any documents, much less any witness, who could cast light on this question."
 
 
 17
 It is true that there were no oral witnesses with direct knowledge, but there were eloquent documents showing a particularized meaning as distinguished from Markson's general term for a boundary description. We have already commented upon Markson's failure to note "so called." Further, he failed to attend that Exhibit 2 was even more individually expressed, "the 'hollow of the Beach' (so called)." Plainly this should have invited inquiry, and consideration of the use of this phrase in earlier deeds.
 
 
 18
 Two short deeds, Exhibit H, Elkanah Paine to Nickerson, April 26, 1864, and Exhibit CC, Edgar and Mary Paine to Young, April 25, 1864, provided the answer, and another, Exhibit J, Mary Paine to Bangs, May 28, 1883, furnished further corroboration. Exhibit H commences "at a place called Backside Run, or Hollow of the beach," and then runs northwesterly, "crossing the Cranberry Meadow of said Edgar Paine and the beach to the north of said Meadow 36 rods to a stake by the seashore." A glance at any map in evidence shows that if the "Hollow of the beach" were the mid-tide line of the beach as described by the witness, or, indeed, any part of the beach as defined by the court, one could not run northwesterly 36 rods before reaching the seashore. In addition, by describing "Hollow of the beach" as "a place called Backside Run," the deed effectively met Markson's thought that "hollow of the beach" was a surveyor's or conveyancer's term.
 
 
 19
 Exhibit CC is, again, specific. This was a grant to Young of a "Cranberry Lot in the Run (so called) on the north side of the Seventh Lot of Land ... running north ... to the Sea Shore or backside, so called." Again, the impossibility; a side boundary cannot run north from the Run if the Run is the seashore. Reading the two deeds together, one has clear definitions: the seashore is the "backside, so called"-a very reasonable appellation to be given by inhabitants who, living on the south side of the Cape, might well consider the shore behind them to be the backside-while somewhat to the south is the "Run," or as described in Exhibit H, the "Backside Run, or Hollow of the beach."
 
 
 20
 In the deed, Exhibit J, the grant runs "northerly ... to the Hollow of the Beach, so called," but the entire lot lies south of the Cranberry Meadow of Young. Thus, again, since Young's Cranberry Meadow lies north of the hollow of the beach, on Markson's, or the court's, definition it must lie in the Atlantic.
 
 
 21
 This demonstration is not answered by the fact that if the Beedes do not have record title to the entire locus, it has not been discovered in anyone. The court's conclusion that the Beedes must have record title because it would be "afactual, preposterous, and incredible" to think that no one had, would, we venture, surprise many examiners of old rural New England titles. In any event, both the force and the logic escapes us.
 
 
 22
 Finally, the court noted that Exhibit 2, although it limited the northern boundary by the hollow of the beach, purported to "includ(e) all the land extending from seashore on the Harbor side to the seashore on the north of said town." From this it concluded that, although Exhibit 1 did not include this phrase, since its monuments and distances were the same, the Exhibit 1 grantors intended to make the same conveyance.
 
 
 23
 In the first place, the intent of a grantor to convey out does not determine the intent of his predecessors to convey in. Exhibits 1 and 2, executed the same day, were presumably prepared together, and one should search for a reason for the difference before assuming an inadvertence. There was a conspicuous one: Exhibit 1 contained a warranty of title. A careful conveyancer, noting what we have already noted, would properly decline to warrant title shore to shore after noting the underlying deeds fixing the northern boundary as the "hollow of the beach." But more important, and perhaps the reason why Markson failed to adopt the court's route, see n.2, ante, even if Exhibit 1 had contained this language, it is settled law that "where real property is described by a particular and definite description, the addition of an inconsistent general description does not enlarge the grant." Crabtree v. Miller, 1907, 194 Mass. 123, 126, 80 N.E. 225 quoted in W. M. Gullicksen Mfg. Co. v. MacNeil, 1964, 347 Mass. 568, at 575, 199 N.E.2d 195. If the metes and bounds did not run to the seashore, neither did the deed.
 
 
 24
 Turning to the measurements, they are as consistent with Cantwell's location of the hollow of the beach as are the prior deeds. One measurement that ran out to the "hollow of the beach so called" was 3,595 feet, and one that came back therefrom was stated to be 2,830 feet. Markson was obliged to concede that both were "grossly in error," viz., grossly short (750 feet at a minimum), if they were intended to run to and from the ocean shore. There was, however, no discrepancy if the "hollow of the beach" was where Cantwell put it.
 
 
 25
 The court disposed of what one might find to be striking confirmation by finding that the figures were simply errors in the deed. Presumably this conclusion was based on the principle that in case of an unavoidable discrepancy, monuments prevail over measurements. The reason for making this choice, however, is that the monument is "certain." Temple v. Benson, 1912, 213 Mass. 128, 132, 100 N.E. 63. It would be applying the rule backwards to employ it when the very question was the monument's location. Wilson v. Hildreth, 1875, 118 Mass. 578.
 
 
 26
 The court's other given reasons do not require comment. One that it did not give, perhaps does. Markson, whose interest in deeds prior to Exhibit 1 was noticeably selective, pointed out that there was a further catch-all provision in Exhibits 1 and 2, namely that, with presently irrelevant exceptions, the tract conveyed "includes all the land conveyed or intended to be conveyed" by three certain deeds. These deeds were Exhibits 16, 17 and J. While the two latter were bound by the hollow of the beach, and confirm all that we have said, Exhibit 16 made no mention of hollow of the beach, and was a grant to the seashore. It is doubtful whether this reference to the earlier deed could prevail over the narrower specific description. See Crabtree v. Miller, ante; see also W. M. Gullicksen Mfg. Co., ante; Cowden v. Cutting, 1959, 339 Mass. 164, 172 n.1, 158 N.E.2d 324 (citing cases); cf. Abbott v. Frazier, 1922, 240 Mass. 586, 593, 134 N.E. 635 (reference to earlier deed effective where not inconsistent with particular description). But even if we were to give effect to this catch-all provision, our conclusion would be the same. Exhibit 16 comprised only some 350 feet of the locus' 2,500 foot or more width. It was, moreover, defined by unreferenced posts and departed houses such that it could not be placed. Under any construction the existence of this single, elusive deed is insufficient to override our general conclusion that the Beedes not only lacked record title, they lacked even paper title to the area north of the hollow of the beach, where the Fearing lot was located.
 
 
 27
 This conclusion facilitates our disposition of the remainder of the case. The inquiry is not phrased in terms of Bessay's predecessors' adverse possession, but only prior possession, which may be a significant difference. E.g., Currier v. Gale, 1865, 91 Mass. (9 Allen) 522; Percival v. Chase, 1903, 182 Mass. 371, 65 N.E. 800; Wishart v. McKnight, 1901, 178 Mass. 356, 59 N.E. 1028. "Such title by prior possession need not have been of such a character as would disseise the true owner, in order to give the superior right...." Currier v. Gale, ante, at 525. So considered, the answer is easy. The Beedes were not only not the true owners, they could not even claim prior constructive possession of the lot by virtue of their deed, Exhibit 2, properly construed. Cf. Dow v. Dow, 1923, 243 Mass. 587, 590, 137 N.E. 746; Jackson v. Boston and Worcester R. R., 1837, 55 Mass. (1 Cush.) 575, 576. Recording an empty assertion to the shore would be too easy a way to accomplish it. Nor did their payment of taxes amount to possession. Whitman v. Shaw, 1896, 166 Mass. 451, 461, 44 N.E. 333. They had nothing else.
 
 
 28
 Bessay, on the other hand, has possessory title tracing back through Fuller to Dorothy Fearing, who bought the shack from Ann Kleinman in 1939, along with any rights in the land or beach that Kleinman might have acquired. There is no evidence of the character of possession of Kleinman, or of her apparent predecessor, Raymond Brown. Fearing, however, testified to her family's exclusive possession of the shack for thirty consecutive summers. During this time they made use of the surrounding land, even if not in accordance with the precise bounds set forth in the Fearing-Fuller quitclaim deed which describes the land now claimed. Much of this deed is a recitation of the Fearings' supposed acts of adverse possession. Fearing denied the truth of many of these assertions at trial, and admitted the document "was made up just to turn over something, anything, to Mr. Fuller that he could use." However, she never contradicted her general use and occupancy. Nor did anyone else.
 
 
 29
 It could be, if Fearing acknowledged fealty to the Beedes, as by accepting a license, that her possession would accrue to them. See Percival v. Chase, 1903, 182 Mass. 371, 375, 65 N.E. 800. The court did not expressly pass on this point, although it seemingly concluded that Fearing's occupancy was permissive and not adverse to the Beedes' claim, apparently on the basis of E. Bennett Beede's testimony that in the Beedes' minds the shack owners were there by permission. If so, the court erred. There is a difference between licensed possession, which is not adverse to the owner or purported owner, and acquiesced-in possession, which is. Ivons-Nispel, Inc. v. Lowe, 1964, 347 Mass. 760, 763, 200 N.E.2d 282; Baumgartner v. Doherty, 1934, 286 Mass. 583, 586, 190 N.E. 838; see Bigelow Carpet Co. v. Wiggin, 1911, 209 Mass. 542, 549, 95 N.E. 938. Bennett Beede's testimony was that he and his family were well aware of Fearing's presence, and in the early fifties sent her a letter requesting her to pay rent on the land, but that she, unlike other shackowners, failed to respond, and never paid any. He further testified, without equivocation, that "(t)here were no conversations" with the Fearings about permitting them to stay on the land. Without any express grant of permission, or any implied acknowledgment by Fearing of the Beedes' purported right, such as by payment of the requested rent, there is nothing here to support a finding of license. See Ivons-Nispel, Inc. v. Lowe, ante; Ryan v. Stavros, 1964, 348 Mass. 251, 263, 203 N.E.2d 85. What was in the minds of the Beedes is not important; it is the acts and conduct of the parties that control.
 
 
 30
 Correspondingly, while Fearing, for her part, entertained strong doubts about her own right to the land beneath and surrounding the shack, and knew the Beedes to be the rumored owners of the property, she never communicated these doubts or beliefs to the Beedes, and never attempted to secure their permission to remain on the premises. Rather, she and her family acted in a manner entirely inconsistent with any Beedes' purported ownership, and, by all appearances, claimed a right to the property under a "deed" from Ann Kleinman. "(T)he uncommunicated mental attitude of the possessor is irrelevant where his acts import an adverse character to his holding ...." Ottavia v. Savarese, 1959, 338 Mass. 330, 334, 155 N.E.2d 432; Flynn v. Korsack, 1961, 343 Mass. 15, 18-19, 175 N.E.2d 397. We must conclude that Fearing's occupancy was in her own right.
 
 
 31
 For the Beedes, this is the end of the road. The evidence does not permit us to find, as matter of law, the precise dimensions of the Fearing lot, but we do order the district court, on a new trial, to approach this question without recognizing any competition by the Beedes except as, and if, accepted licensors of other, independent lots. The difficulty we apprehend will be to distinguish between land recognized as communal and that which, at least tacitly, was regarded as primarily appendant to Fearing's shack. Any loss of communal rights, or easements, must also be considered. We do not reach any claim against the government on account of the shack or lot being "improved property." 16 U.S.C. § 459b-3(d).
 
 
 32
 The judgment of the district court is reversed, and the case remanded for further proceedings consistent herewith.
 
 
 
 *
 Of the District of Puerto Rico, sitting by designation
 
 
 [1]
 Both in the district court and here, government counsel was highly partisan to the Beedes, on the facts, and was permitted to amplify their case by cross-examining witnesses with vigorous leading questions. This is as far from an amicus as one can get. See New England Patriots Football Club, Inc. v. University of Colorado, 1st Cir., 1979, 592 F.2d 1196, 1198 n.3. This is not to say that the government has no interest in the outcome, but we object to its posing as an amicus
 
 
 [2]
 Markson:
 "The only difference is that in Exhibit 2, in describing the locus, Exhibit 2 picks up the additional language, 'including all the land extending from seashore on the harborside to the seashore of the north side of said town.' The part of the description, I believe, which is probably of most importance is that in both of these exhibits, basically, the northern boundary is described as running along something called the 'hollow of the beach.' "
 
 
 [3]
 "Fuller contends that the phrase 'hollow of the beach' refers to a valley between two irregularly shaped sand dunes which are located some 700-900 feet more or less away from the mean high water mark ... (The court's) view established that ... (t)here is presently ... one low area between two groups of dunes where there is some vegetation growing and this area appears from a geological survey map, to be the lowest point in the entire tract." Certain land, ante, at 1254-55
 
 
 [4]
 The fact that a witness is an expert does not justify an opinion for which he can show no basis or reason. See Ruschetti's Case, 1938, 299 Mass. 426, at 430-31, 13 N.E.2d 34 ("guess or conjecture")