**NEW ENGLAND PATRIOTS FOOTBALL CLUB, INC.,**
Plaintiff, Appellee,

v.

**UNIVERSITY OF COLORADO et al.,**
Defendants, Appellants.

No. 79–1043.

United States Court of Appeals,
First Circuit.

Argued Feb. 6, 1979.
Decided Feb. 9, 1979.

Earle C. Cooley, Boston, Mass., with whom Neil H. Jacobs, and Hale & Dorr, Boston, Mass., were on brief, for defendants, appellants.

John H. Blish, Providence, R. I., with whom Robert G. Flanders, Jr., and Edwards & Angell, Providence, R. I., were on brief, for plaintiff, appellee.

John C. Russell, Lawrence Kill, Anderson, Russell, Kill & Olick, P. C., Steven M. Pesner, John E. Daniel, and Andrew P. Brozman, New York City, on brief for Charles L. Fairbanks, amicus curiae.

Before ALDRICH, Circuit Judge, MURRAY * and DEVINE,* District Judges.

* Sitting by designation.

ALDRICH, Senior Circuit Judge.

In 1973 one Charles L. Fairbanks contracted with plaintiff New England Patriots Football Club, a professional football organization and member of the National Football League, to act as its manager and head coach. By later agreement the employment was to continue until January, 1983. The contract contained a provision that Fairbanks was not to provide services connected with football to any entity other than plaintiff, or to perform services of any kind for anyone, without plaintiff's permission, during the period of employment.[1] In November, 1978 Fairbanks was approached by various persons, defendants herein, some of whom were officially, and some sentimentally, attached to the University of Colorado. Defendants' objective was to persuade Fairbanks to quit the Patriots and become head football coach at the University. Their successful initiation of this endeavor, at first behind the Patriots' back, and, later, over its vigorous opposition, resulted in the present action where, following a hearing, the district court entered a preliminary injunction enjoining defendant regents, defendant president, defendant athletic director, and defendant Vickers, a Colorado football fan and angel, from causing the University to employ Fairbanks as the University's coach. Fairbanks is not a party to the suit, and has not been enjoined.

Defendants appeal. In connection with the appeal, they moved for a stay pending resolution. This we denied. At the same time, in response to the representation by counsel for defendants that time was of the essence because of the nature of the employment, we agreed to expedite the hearing. We also acceded to Fairbanks' request, tendered through counsel for defendants, to file an amicus brief.

■ Although this is not our first experience with the athletic mileau's response to legal embroilment engendered by contract jumping,[2] we set out the factual contentions in some detail in order to get in the mood. For this opportunity we are primarily indebted to the Fairbanks amicus brief.[3]

The extension of the contract to January 26, 1983 was agreed to on June 6, 1977. The briefs are silent as to this date, an understandable reticence in view of the fact that by that time Fairbanks had, apparently, already decided he might not keep his word.

"For a number of years, Fairbanks was extremely unhappy with remaining in professional football [and] . . . with his present location . . . Fairbanks believed the health of his family, and a reassessment of career objectives, *mandated a change.* Accordingly, for a number of years, he had been investigating business opportunities outside football, as well as coaching at the college level, . . ." (Amicus br. 8) (Emphasis suppl.)

changes which, because unconnected with professional football, "should present no problem." (Amicus br. 6–7) This justification for nonperformance so satisfied Fairbanks that it was followed by a footnote expressing indignation at the court's refusal to recognize it.

---

1. "10(b) Fairbanks shall not render services directly connected with football during the period of his employment other than for the Patriots except with the express written permission of the Patriots, which permission shall not be unreasonably withheld."

"(d) Fairbanks shall not render services to another entity not connected with football during the period of employment except with the express written permission of the Patriots, which permission shall not be unreasonably withheld."

2. Cf. *Boston Professional Hockey Ass'n, Inc. v. Cheevers,* 1 Cir., 1972, 472 F.2d 127.

3. In granting permission we had assumed, wrongly, it proved, that counsel knew what an amicus is, namely, one who, "not as parties, . . . but, just as any stranger might," *Martin v. Tapley,* 1875, 119 Mass. 116, 120, "for the assistance of the court gives information of some matter of law in regard to which the court is doubtful or mistaken," 1 Bouvier's Law Dictionary 188 (3d ed. 1914), rather than one who gives a highly partisan, ("eloquent," according to defendants) account of the facts.

■ Nor was this the only mantle of protection. Because in 1973 the Patriots allegedly had lured Fairbanks from the University of Oklahoma, inducing him to break his contract there, defendants conclude that the Patriots are barred from relief by the doctrine of unclean hands. We disagree. Both parties may have done the University of Oklahoma dirt, but that does not mean unclean hands with respect to "the controversy in issue." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 1945, 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381. *Cf. Houston Oilers, Inc. v. Neely,* 10 Cir., 1966, 361 F.2d 36, 42, *cert. denied,* 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74. The precedential effect of a court's extending this doctrine to commercial transactions such as this staggers the imagination. In all fairness, Fairbanks was not concerning himself, perhaps, with commercial transactions;[4] in fact, he seems put out that anyone should suppose he had to. It was only *noblesse oblige* that caused him to speak to the Patriots' owner, William Sullivan, at all.

"The purpose of this meeting was that Fairbanks felt he owed a personal responsibility to Sullivan to tell him the reasons for his leaving." (Amicus br. 9)

Finally, he was misrepresented; crass materialism had nothing to do with it.

"The impression that the Patriots attempt to make—that Fairbanks was induced to leave for money—simply is not true." (Amicus br. 9–10).

Money does create some problems, however, quite apart from inducing Fairbanks to sign for an engagement that he had little intention of keeping.[5] If ascertainable money damages could fully compensate the Patriots, under familiar principles there would be no basis for injunctive relief. The district court, however, found that ascertainment would be difficult. It further found that Fairbanks' services were unique, and that, accordingly, the loss of his services would occasion the Patriots irreparable harm.

Fairbanks was insufficiently modest to dispute this last. However, the cause was taken up by the defendants. They dispute both findings, offering reasons which, to put the matter in its kindest light, we may be too unsophisticated to understand.[6] Then, in a turnabout for which, perhaps apprehending our shortcomings, no reasons are even offered, defendants state,

"In contrast, the continuation of the preliminary injunction which prevents Fairbanks from signing with Colorado does irreparably harm the University." (Defendants' br. 40)

While we are attempting to reconcile these conclusions, there comes the final drive.

"Fairbanks' departure may have no effect or, even possibly a beneficial effect, on the Patriots' performance and attendance in the future." (Defendants' br. 42).

The injunction is an ungracious, even an ungrateful, act.

Somehow it seems as if there were an extra man on the field.

Whatever may be thought rules elsewhere, the legal rules are clear. A contract is not avoided by crossed fingers behind one's back on signing, nor by unsupported, and at once inconsistently self-deprecating and self-serving protests that the breach was to the other party's benefit. Equally, we are not taken by Fairbanks' claim that because, when he told Sullivan that he was leaving at the end of the season and Sullivan responded that he was "suspended," it was Sullivan who broke the contract.

"The simple fact is that Fairbanks was fired." (Amicus br. 11)

---

4. "Fairbanks' testimony made clear that he was not thinking of legal problems . . . .." (Amicus br. 9, n.)

5. On Fairbanks' testimony at the hearing, customarily the longer the period agreed to, the larger the annual salary.

6. Defendants, further, ignore the doctrine that they cannot, particularly at this stage, attack findings that are supported by evidence, as these clearly are. *Engine Specialties, Inc. v. Bombardier, Ltd.,* 1st Cir. 1972, 454 F.2d 527, 530.

Whatever may be thought the meaning in the trade of suspension, as distinguished from its commonly understood meaning, it is a novel concept that a contract-breaker had the option to require the other party to accept his choice of dates. At least until Fairbanks withdrew his unlawful announcement, the Patriots had a right not to accept the services of an unfaithful servant, or, as Sullivan put it to him at the time, one who had "his body in Foxboro and his heart in Colorado." [7]

In this circumstance defendants are reduced to three claims: that they are protected from suit by the Eleventh Amendment of the Constitution; that the court lacks jurisdiction because Fairbanks, who was not joined, is an indispensable party, and that the injunction should not be granted, both because it is an indirect way of avoiding the rule that a personal service contract cannot be specifically enforced, and in any event, because Fairbanks, by employment at the college level, would not be engaging in competition with the Patriots. Because the injunctive issue flows naturally as part of the factual recitation we have just interrupted, we will treat it first.

At the hearing Fairbanks testified that although the contract read "services directly connected with football  .  .  . [or for] another entity not connected with football," this meant, simply, activities competitively connected with the Patriots. Apparently he has no more regard for the parole evidence rule forbidding the contradiction of unambiguous language than for other rules foisted upon him by legalisms. Parenthetically, having in mind, as sometimes helpless dial-spinners, that professional and prominent college football teams compete for TV viewers, and hence, presumably, for the advertising dollar, we may wonder whether we have to accept at face value the protestation of no competitive activity here. In any event, there is ample authority contradicting both aspects of defendants' legal position. Indeed, some courts have gone even further, and have enjoined the defaulting athlete himself from noncompetitive sport. *E. g., Munchak v. Cunningham,* 4th Cir., 1972, 457 F.2d 721 (ABA player enjoined from play with NBA, prior to merger); *Houston Oilers, Inc. v. Neely,* ante (AFL player enjoined from NFL play, prior to merger); *Nassau Sports v. Peters,* E.D.N.Y., 1972, 352 F.Supp. 870 (NHL player enjoined from play in fledgling WHA); *Winnipeg Rugby Football Club v. Freeman,* N.D.Ohio, 1955, 140 F.Supp. 365 (player under contract to Canadian team and NFL team enjoined); *see also Boston Professional Hockey Ass'n v. Cheevers,* ante (chance of irreparable harm shown by players under contract with NHL team jumping to WHA); *American League Baseball Club v. Pasquel,* Sup.Ct., 1946, 187 Misc. 230, 63 N.Y.S.2d 537 (Mexican League enjoined from inducing American League players from repudiating contracts). We would not distinguish between an athlete and a coach. To enjoin tortious interference by a third party, whether or not competitive, would seem a lesser step. *See Winnipeg Rugby Football Club v. Freeman,* ante; *Pino v. Trans-Atlantic Marine, Inc.,* 1970, 358 Mass. 498, 265 N.E.2d 583; *Moore Drop Forging Co. v. McCarthy,* 1923, 243 Mass. 554, 137 N.E. 919; *American League Baseball Club v. Pasquel,* ante.

While there is contrary authority, in this circumstance we need only refer to the familiar principle that at the preliminary injunction stage an appellate court will not reverse if there is a supportable legal basis for the district court's action even if, on final analysis, it may prove to be mistaken. *Roselli v. Affleck,* 1st Cir., 1974, 508 F.2d 1277, 1280.

We comment briefly on the self-serving statement in Fairbanks' amicus brief that he is "through with professional football." There is no such finding in the record, and even though that may now be the conventional wisdom, neither the Patriots nor the

---

7. The district court's finding that a valid contract existed between Fairbanks and the Patriots and that Sullivan's suspension of Fairbanks was not a breach are not clearly erroneous and,

at this stage, must be accepted. Of course, Fairbanks, not a party to the suit, is not bound by these, or any other findings.

court are bound to accept it. At this stage Fairbanks could be expected to say no less. Defendants' constant stress that the injunction is unproductive, and nothing but "punishment" in light of the fact that a position with the University "is the only game in town," is a total non-sequitur that cuts the other way. If there may, in part, be a punitive effect, we could not avoid wondering how great a miscarriage that would be with respect to one who, on his own testimony, promised a longer term than he intended to keep, not only to afford himself sanctuary while he looked around, but, again on his own testimony, putting himself in line for higher pay meanwhile, and whose seeming only defense to his announced total breach is a claim that the Patriots grabbed the gun.

█ This same principle that we need not finally resolve all possibly debatable questions of law is fully sufficient to dispose of defendants' claim that Fairbanks is an indispensable party, F.R.Civ.P. 19(a) and (b). The standard steps which here lead us to the ultimate question of fairness are too familiar to require repeating. What is fair is, basically, a subjective question. Some courts in inducing-breach-of-contract cases have regarded the question as too insubstantial to require comment, and have allowed the case to proceed without the other contracting party in silence. *See, e. g., Engine Specialties, Inc. v. Bombardier, Ltd.,* ante; *Beekman v. Marsters,* 1907, 195 Mass. 205, 80 N.E. 817. Indeed, defendants cite no persuasive authority the other way. It is to be borne in mind that any issue of fairness is only fairness to Fairbanks; defendants can suggest no unfairness to themselves resulting from his absence. They do say that it would be unfair to Fairbanks if, due to possibly divergent interests, they omitted points he might have made. Having been exposed, through his amicus brief, to the points that Fairbanks might personally make here, it might be difficult to be moved by this contention even if, in the abstract, it were a valid one. More important, on the single issue in this case, we perceive no different interests.

On the broader questions, general rights of Fairbanks and the Patriots under the contract, the decision will have no effect because Fairbanks is not a party, and for the further reason that it could not seemingly affect them even if he were.

It is a conceded fact that in a pending judicial proceeding brought by Fairbanks in the state of Colorado in which the Patriots is a defendant, Fairbanks has been ordered to respect the contract provision and arbitrate his dispute before the Commissioner of the National Football League.[8] This seems a complete answer to defendants' claim that by plaintiff's failure to join Fairbanks as a party, plaintiff is engaging in "piecemeal litigation." Rather, plaintiff appears to have no justiciable claim against him in a court of law. We reject the claim that Fairbanks is an indispensable party.

Finally, although normally jurisdictional issues receive first treatment, because it requires an overview of the fact we have left to the last defendants' claim of the bar of the Eleventh Amendment to the Constitution. Briefly, defendants say that because the University is a state institution—part of the state—they share the state's Eleventh Amendment immunity from suit.

█ We accept, for this purpose, the University's identification with the state. *Cf. George R. Whitten, Jr., Inc. v. State University Constr. Fund,* 1 Cir., 1974, 493 F.2d 177. It does not follow that everything its agents do falls under the constitutional umbrella. The question is whether the conduct is authorized state action, and the answer is not that the agents decided to do it, or even that it was in furtherance of a goal within their general authority. *See, e. g., Johnson v. Lankford,* 1918, 245 U.S. 541, 38 S.Ct. 203, 62 L.Ed. 460; *Hopkins v. Clemson Agricultural College,* 1911, 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890. Nor are the cases involving past activity, where the state's possession cannot be disturbed by suit against its agents, in point; *Edelman v. Jordan,* 1974, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662; *Great Northern Ins. Co. v. Read,* 1944, 322 U.S. 47, 64 S.Ct. 873, 88

8. "10(f) Fairbanks agrees to abide by and be legally bound by . . . the decision of the

Commissioner which decision shall be final, conclusive and unappealable."

L.Ed. 1121, we are involved solely with restraining future activity.[9] *Edelman v. Jordan,* ante, 415 U.S. at 664, 94 S.Ct. 1347; *Ex parte Young,* 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714. In the present case, this is a very narrow issue. We may assume that if a contract had been entered into between Fairbanks and the University, suit would not lie to undo it. We do not, however, equate that with restraining the agents, while they are engaged in seeking a contract, from acting in an unlawful and tortious manner. The latter is not barred by the Eleventh Amendment. *Ex parte Young,* ante; *Byram River v. Village of Port Chester,* S.D.N.Y., 1975, 394 F.Supp. 618, 628; *see* P. Bator, P. Mishkin, D. Shapiro, H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System, 1368 (2d ed. 1973). As Mr. Justice Lamar observed in *Hopkins v. Clemson Agricultural College,* ante, 221 U.S. at 642–43, 31 S.Ct. at 656,

"[I]mmunity from suit is a high attribute of sovereignty—a prerogative of the State itself—which cannot be availed of by public agents when sued for their own torts. The Eleventh Amendment was not intended to afford them freedom from liability . . . where, under color of their office, they have injured one of the State's citizens.

. . . . .

"The many claims of immunity from suit have therefore been uniformly denied, where the action was brought for injuries done or threatened by public officers. If they were indeed agents, acting for the State, they—though not exempt from suit—could successfully defend by exhibiting . . . lawful authority under which they acted. . . . But . . . neither a State nor an individual can confer upon an agent authority to commit a tort so as to excuse the perpetrator . . . [who must be] subject to injunction against the commission of acts causing irreparable injury." [10] (Citations omitted)

*Johnson v. Lankford,* ante.

*Affirmed.*

---

9. Nothing in this opinion is to be taken as passing on the question whether the regents may be accountable for damages.

10. Both parties have misunderstood the *Clemson* case. There a college chartered by the state erected on land that it occupied a dyke, the effect of which was to cause waters to overflow and wash away land belonging to the plaintiff. Title to the college lands was in the state. Plaintiff sued the college for damages and for equitable relief. The college answered that the state was an indispensable party, raised the Eleventh Amendment, and moved, accordingly, to dismiss on jurisdictional grounds. The Court disagreed.

Defendants dispute the pertinency of *Clemson,* pointing out that the Court expressly held that, unlike the University of Colorado, the college was not an arm of the state. Plaintiff would equate the two, but defendants are clearly correct. What the parties fail to note is that in *Clemson* there was another layer; with respect to the land the college was an agent of the state. Once the dyke was built, the state's immunity came into play. If, however, in building it the college committed a tort, the college, though the state's agent, was liable therefor to the plaintiff.

"[I]f the facts hereafter warrant it, the college may be enjoined against further acts looking to the maintenance or reconstruction of the dyke." 221 U.S. at 649, 31 S.Ct. at 659.

So here, the regents may be enjoined from making a contract by unlawful or tortious means even though the University be regarded as the state itself.