Charles W. **LEIGH, et al., Plaintiffs,**

**and**

**George Johnson, et al., Intervenors,**

**v.**

**Clyde William ENGLE, et al., Defendants.**

**No. 78 C 3799.**

United States District Court, N. D. Illinois, E. D.

Jan. 22, 1982.

---

Ware Adams, Chicago, Ill., for plaintiff.

Morton Denlow, Sachnoff, Schrager, Jones, Weaver & Rubenstein, Ltd., Chicago, Ill., Dent, McNeela & Griffin, Edward McNeela, Richard C. Moenning, Chicago, Ill., for defendant.

## MEMORANDUM

LEIGHTON, District Judge.

The parties are now before the court on fully briefed cross-motions for summary judgment; but consideration and ruling have been delayed by a request of Raymond Donovan, Secretary of Labor, for leave to participate in the case and file what he says is a memorandum amicus curiae. Plaintiffs support the Secretary; but defendants oppose, arguing that this is an inexcusable and dilatory tactic; that it is a filing which will interfere with a fair consideration of the pending motions. The civil action which is generating these collateral issues is one alleging that plaintiffs have vested benefits in a profit sharing plan of their former employer. They bring this action under ERISA, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* They invoke the jurisdiction of this court under 29 U.S.C. § 1132(f).

According to the Secretary of Labor, several issues of first impression under ERISA arise from facts peculiar to this case. And for this reason, he wishes to ensure that his views and those of his department are made known and considered in the development of case law that will interpret this important federal statute. However, after considering the evolution of amicus curiae practice, the nature of this litigation, and the content of the proffered memorandum, the court concludes that the Secretary of Labor should not be permitted to file what he calls but what is not a memorandum amicus curiae.

### I

The term "amicus curiae" is old Latin which literally means "a friend of the court", 3A C.J.S. Amicus Curiae § 2; it has been traditionally used to describe one who, for the benefit and assistance of a court, informs it on some matter of law in regard to which the judge is doubtful or mistaken. 4 Am.Jur.2d Amicus Curiae § 1; 2 Coke, 2d Inst. 178, 2 Vine, Abr. 475, *cited in Cyclopedic Law Dictionary* 53 (2d Ed., James C. Cahill, 1922). Although the custom of allowing a person to serve as a friend of the

court cannot be traced to its origin, it is immemorial in English law. 1 *Bouvier's Law Dictionary* 188 (Rawle's revision 1914). The amicus did not even have to be an attorney to intervene, and the general attitude of the courts was to welcome such aid, since "it is for the honor of a court of justice to avoid error." *The Protector v. Geering*, Hardres 85–86 [1656] 145 E.R. 394 (Ex.); *see* Note, *Amici Curiae*, 34 Harv.L. Rev. 773 n.5 (1921).

■ Historically, then, an amicus curiae is an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and whose function is to advise in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another. *Cf. Allen v. County School Board of Prince Edward Co.*, 28 F.R.D. 358, 362 n.2 (E.D.Va.1961). Indeed, if the proffer comes from an individual with a partisan, rather than impartial view, the motion for leave to file an amicus brief is to be denied, in keeping with the principle that an amicus must be a friend of the court and not a friend of a party to the cause. C. Rembar, *The Law of The Land* 330 (1980). One permitted to proceed as amicus traditionally did so in the form of suggestions to the court on doubtful questions of law, *The Claveresk*, 264 F. 276, 279 (2d Cir. 1920); and in regard to which the court appeared to be in danger of going wrong. *Blanchard v. Boston & M. R.R.*, 86 N.H. 263, 167 A. 158, 160 (1933). The privilege of being heard amicus rests in the discretion of the court which may grant or refuse leave according as it deems the proffered information timely, useful, or otherwise, 3A C.J.S. Amicus Curiae § 3; and absent a statute to the contrary, no distinction is made between the request of a private person for leave to appear amicus curiae, *McLeod v. General Electric Company*, 257 F.Supp. 690 (S.D.N.Y.1966), and one by an agent of the government, *Alexander v. Hall*, 64 F.R.D. 152 (D.S.C.1974); *Allen v. County School Board of Prince Edward County*, 28 F.R.D. 358 (E.D.Va.1961).

## II

This suit is the outgrowth of a transaction by which in April 1977 defendants Clyde William Engle and Libco Corporation acquired control of the Reliable Manufacturing Corporation. For its 70 to 85 workers, Reliable had an employees' profit sharing plan trust. It is alleged by plaintiffs that Engle, 52% owner of Libco, an investment company through which he controls several other corporations, designated defendants Nathan Dardick and Ronald Zuckerman as administrators of the plan. It is further alleged that in the period 1978–1979, defendants caused trust funds of the plan to be applied, along with their own monies and credit, and along with money and credit of parties-in-interest, toward purchase of the common stock of three corporations which were targets of take-overs by Engle and Libco: Berkeley Bio-Medical, Inc., Hickory Furniture Company, and Outdoor Sports Industries, Inc.

Defendants admit that the shares in question were acquired by the plan; but they say that in each instance, the stocks were later sold at great profit to the fund. However, it is the alleged use of trust funds by defendants, not loss to the plan or transfer of fund assets to defendants, which plaintiffs claim are violations of the applicable statutory provisions and which they claim make defendants liable as fiduciaries and parties-in-interest within the definitions of ERISA. The suit was filed on September 22, 1978; it has been through numerous pretrial proceedings, including certification of a class, intervention by participants in the fund, motions to compel discovery requests, and submission to the court of fully supported cross-motions for summary judgment.

Plaintiffs inform the court that from inception of this suit, they complied with 29 U.S.C. § 1132(h) which provides that "[a] copy of the complaint in any action under this subchapter by a participant, beneficiary, or fiduciary ... shall be served upon the Secretary [of Labor] ... by certified mail." In the more than three years of court proceedings, no interest in this litiga-

tion has ever been expressed by the Department of Labor; but with commendable candor, on filing his motion for leave to appear amicus, the Secretary "apologizes for any delay in consideration of this cause arising out of this motion. Although we have been aware of the litigation for some time, we delayed our response in order to gain the benefit of defendants' responsive pleadings and memoranda." The court is not told what benefit has been derived from the responsive pleadings and memoranda. However, the proffered memorandum consists of four parts.

In the first, the Secretary explains the responsibilities for the administration and enforcement of Title I of the Employee Retirement Income Security Act of 1974, ERISA, 29 U.S.C. § 1001 *et seq.*, which Congress has placed on him. He says that in one part of Title I of ERISA, there are set forth federal standards to which all fiduciaries of covered employee benefit plans must conform. According to the Secretary, "Congress explicitly recognized, during consideration of ERISA, that these plans constitute a handy source of cash which could be, and much too often have been, used to benefit persons other than the participants of the plan." The Secretary tells the court that every decision under this important federal statute, during its present state of development, has special significance; and this is particularly true where, as in this case, "two of the legal theories are matters of first impression under ERISA."

In the second part, the Secretary elaborates on the statutory framework of ERISA, particularly the fiduciary provisions. He says that through the sections governing specific prohibitions applicable to plan fiduciaries there runs a common threat uniting them; a thread reflecting the length to which Congress has gone in assuring that fiduciaries administer employee benefit plans with single minded devotion to the interest of participants and beneficiaries. "This concept of absolute loyalty is, of course, not new—courts have traditionally implied a fiduciary relationship with concomitant responsibilities in a variety of situations." According to the Secretary, ERISA's definition of such terms as "fiduciary" and "party-in-interests" reflect the extent to which Congress has gone in insuring protection of participants in a plan, and enforcing provisions against fiduciaries who breach their obligations in administering plan assets.

In the third part, the Secretary summarizes his arguments. The gist of his assertions concerns the facts of this case, some unknown to the court because the parties' submissions have not been considered. He recites, as established fact, that early in the months of 1978 the defendant Engle, and the companies associated with him, engaged in attempts to obtain control of three publicly held companies. He refers to the fact that plaintiffs have alleged the purchase of stock in these three companies by fiduciaries of the plan, using plan assets to aid defendants' takeover attempts. The Secretary then sets forth the three elements which plaintiffs must satisfy to sustain their case: "(1) knowing actions by 'fiduciaries' in transactions involving 'parties-in-interest'; (2) a 'use' of Plan assets for the benefit of parties-in-interest; and (3) profits derived by fiduciaries or parties-in-interest from transactions taken in violation of ERISA which must be disgorged." Thereafter, he proceeds to show that in each instance plaintiffs have established the elements of their case, including the additional claim that defendants have violated the provisions of ERISA by discriminating against the named plaintiffs in this suit with regard to possible assessment of legal fees. The Secretary then concludes, and urges this court to do so, that disgorgement of profits is the relief to which plaintiffs are entitled. This conclusion is apparently based on the fact that in this case plaintiffs will not be able to prove any loss by the plan, nor any transfer of plan asset or funds to defendants.

The fourth and final part of the memorandum contains five subparts in which the Secretary presents the details of his arguments. In every respect, he supports plaintiffs' legal theories and their construction

of the facts, many of them disputed by defendants. Prior to telling the court that judgment in this case should be entered for plaintiffs and against defendants with grant of relief of disgorgement, the Secretary states that:

> In sum, the court has been presented with a clear cut choice—either the Plan purchase these stocks without regard to the takeover attempts or the defendants could not resist the temptation to use the cash in the Plan under their control to increase the holdings in their attempts to purchase control over these companies. We think the court could readily reach the latter conclusion, and from it would follow that defendants used the money earmarked to provide retirement security for hundreds of working men and women to advance their own interests. ERISA cannot be read to condone this behavior.

### III

█ In this court's judgment, this is not a memorandum amicus curiae, one filed as a friend of the court. In fact, to coin a Latin phrase, it is a memorandum *amicus petitor*, one proffered as a friend of the plaintiff[s]. *Cf. New England, etc. v. University of Colorado*, 592 F.2d 1196, 1198 n.3 (1st Cir. 1979). The Secretary of Labor should not be allowed to file such a memorandum; intervention in this manner in a trial court has never been favored in Anglo-American law. This point has been emphasized by one court of appeals which commented that a district court, a forum whose principal function is resolving issues of fact, should go slow in accepting an amicus brief unless it has the joint consent of the parties. *See Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970).

It is true that in the appellate levels of the federal judiciary "the institution of the amicus curiae brief has moved from neutrality to partisanship, from friendship to advocacy." Krislov, *The Amicus Curiae Brief: From Friendship to Advocacy*, 72 Yale L.J. 694, 704 (1963). For example, the Supreme Court of the United States makes no pretense of disinterestedness "on the part of 'its friends'. The amicus is treated as a potential litigant in future cases, as an ally of one of the parties, or as the representative of an interest not otherwise represented." Krislov, *supra* at 704; *see Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946). In the courts of appeals, Rule 29 of the Federal Rules of Appellate Procedure, while requiring written consent of all parties or leave of court before a brief amicus curiae can be filed, provides that "consent or leave shall not be required when the brief is presented by the United States or an officer or agency thereof...." This shift in traditional amicus curiae practice may be useful in a reviewing court where, usually, only issues of law are resolved; it is not proper in a trial court.

It is not proper because it injects an element of unfairness into the proceedings now pending before this court. The defendants in this case are entitled to have their contentions and arguments on the summary judgment motions considered without having the weight of the United States, speaking through the Secretary of Labor, joining plaintiffs in the assertion that there are no issues of material fact, that defendants have violated the provisions of ERISA, and thus are liable to a judgment ordering them to disgorge profits they have made from alleged breaches of trust.

The rules of law to be applied are neither complex nor esoteric. As the Secretary points out, Congress, when it enacted this important statute, did nothing more than federalize and codify the common law of trusts, to be enforced, as they always have been, by elemental principles of equity. Careful review of the record of this case, and a detailed study of 29 U.S.C. § 1001 *et seq.*, the Employees Retirement Income Security Act, do not disclose any point of law in regard to which this court is doubtful or mistaken, or concerning which it is in danger of going wrong. Therefore, an appropriate order will be entered denying the Secretary's motion for leave to file a memorandum amicus curiae.

Dorothy GAUTREAUX, Odell Jones, Do-
reatha R. Crenchaw, Eva Rodgers,
James Rodgers, and Robert W. Fairfax,
Plaintiffs,

v.

Samuel PIERCE, Secretary of the De-
partment of Housing and Urban Devel-
opment of the United States, Defendant.

No. 66 C 1460.

United States District Court,
N. D. Illinois, E. D.

Jan. 25, 1982.

Alexander Polikoff, Howard A. Learner,
Chicago, Ill., for plaintiffs.

Dan K. Webb, U. S. Atty., Robert Gross-
man, Roan & Grossman, Patrick W.
O'Brien, Mayer, Brown & Platt, Richard
Flando, Acting Regional Counsel, Gershon M.
Ratner, Carolyn B. Lieberman, John W.
Herold, Edward G. Weil, Dept. of Hous-
ing & Urban Development, Stanley J.
Garber, Corp. Counsel, Calvin H. Hall, Gen.
Counsel, Chicago Housing Authority, Earl
L. Neal, Sp. Asst. Corp. Counsel, Chicago,
Ill., Jane McGrew, Gen. Counsel, Dept. of
Housing and Urban Development, Wash-
ington, D. C., Gerald D. Skoning, Seyfarth,

Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This litigation began in 1966 when plaintiffs, approximately 43,000 black tenants of and applicants for public housing in the Chicago area, brought related actions against the Chicago Housing Authority ("CHA") and the United States Department of Housing and Urban Development ("HUD") alleging that defendants had violated their rights under the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 et seq., and the equal protection clause of the fourteenth amendment. HUD was charged along with CHA with instituting and promoting racially discriminatory policies and practices that resulted in low income housing being built in exclusively black neighborhoods in Chicago and in racial quotas that limited the number of black families in white housing projects. Both HUD and CHA were found liable to the plaintiffs for their respective roles in contributing to Chicago's discriminatory housing patterns,[1] but meaningful relief for the plaintiff class was consistently thwarted through the delay occasioned by innumerable appeals and by defendants' refusal to take appropriate remedial action.

Finally, after more than a decade of intense litigation at all levels of the federal court system, a consent decree was negotiated between the plaintiffs and HUD that purported to encompass a workable plan for delivering long overdue relief to the plaintiff class. As part of the consent decree, which was approved by the Court on June 16, 1981, HUD agreed to provide 7,100 units of assisted housing[2] for the plaintiff class in specified areas of the Chicago Standard Metropolitan Statistical Area through various housing programs administered by HUD designed to stimulate the development of low income housing. An important, if not vital, adjunct to one of these HUD programs (Section 8 New Construction and Substantial Rehabilitation) is the Government National Mortgage Association Tandem Financing program ("GNMA Tandem") through which GNMA, a wholly-owned government corporation, indirectly provides a source of financing for housing development to serve low income persons. GNMA purchases FHA-insured mortgages issued to eligible developers by private lending institutions at below market rates and resells them at current market prices, absorbing the loss as a subsidy. The Reagan Administration has proposed that the GNMA Tandem program be eliminated in fiscal year 1983, however, and this matter is presently before the Court on plaintiffs' motion to enforce or, alternatively, to modify the consent decree in light of the current uncertainty with respect to the future of the Tandem program.

Paragraph 8.1 of the consent decree provides that:

1. A catalogue of the many opinions in these consolidated cases can be found in *Gautreaux v. Landrieu*, 523 F.Supp. 665 (N.D.Ill.1981).

2. Assisted housing is defined in paragraph 2.1 of the consent decree as follows:

2.1 "Assisted housing" means non-elderly housing subsidized by HUD, directly or through a public housing agency, under the following housing programs or under any housing program enacted by Congress or established by HUD in the future for the benefit of poor persons as an addition to or alternative or substitute for such programs: Section 8 Housing Assistance Payments Program— New Construction (24 C.F.R. Part 880), Substantial Rehabilitation (24 C.F.R. Part 881), Existing Housing (24 C.F.R. Part 882, Subparts A and B), Moderate Rehabilitation (24 C.F.R. Part 882, Subparts D and E), State Housing Agencies (24 C.F.R. Part 883) and Special Allocations (known as Loan Management and Property Disposition, 24 C.F.R. Part 886); Public Housing New Construction and Acquisition, with or without rehabilitation (24 C.F.R. Part 841); Rent Supplement (24 C.F.R. Part 215); and Rental Assistance Payments Program (24 C.F.R. Part 236, Subpart D). However, no project or housing units receiving either Rent Supplement or Rental Assistance Payments in whole or in part on or before the "effective date," as defined herein, shall be deemed to be assisted housing under this Decree.

The only program involved in the instant dispute is Section 8 New Construction and Substantial Rehabilitation.

Jurisdiction is retained by the Court for the purpose of enabling the plaintiffs and HUD to apply to the Court at any time for such further orders as may be necessary or appropriate for the construction, implementation, modification or enforcement of this Consent Decree.