Connolly, J.

BACKGROUND

This civil action arises from an alleged case of “contract jumping” by Donald A. Brown, Jr. (“Brown”), at the alleged instigation of and “tampering” by the University of Massachusetts at Amherst (“U. Mass.”) and its athletic department.
In 1960, Judge J. Skelly Wright in Detroit Football Co. v. Robinson, 186 F.Sup. 933, 934 (E.D.La. 1960), described these types of “contract jumping cases” with players and coaches as follows:
This case is but another round in the sordid fight for football players [or coaches] ... It is a fight characterized by deception, double dealing, campus jumping, secret alumni subsidization, semi-professionalism and professionalism. It is a fight which has produced as part of its harvest this current rash of contract jumping suits. It is a fight which so conditions the minds and hearts of these athletes [and coaches] that one day they can agree to play [or coach] football for a stated amount for one group, only to repudiate that agreement the following day or whenever a better offer comes along.
Brown has been the head football coach at Northeastern University (“Northeastern”) since 2000. On or about July 8, 2003, Northeastern entered into a written Employment Agreement (“Contract”) with Brown pursuant to which Northeastern agreed to employ Brown as its head football coach through the end of the 2007-2008 football season. At the time that he signed the Contract in 2003, Brown and his assistant coaches received substantial salary increases from Northeastern.
Article VIII of the Contract, captioned “outside employment,” provided as follows:
Coach [Brown] agrees to devote full time and effort to the University and agrees not to seek, discuss, negotiate for, or accept other employment during the term of this Agreement without first obtaining the written consent of the President of the University. Such consent shall not be unreasonably withheld.
Article IX of the Contract, captioned “Liquidated Damages,” provides that, “[e]xcept as otherwise noted herein,” if Brown leaves Northeastern prior to the end of the contract period, then Brown “shall pay to the University as liquidated damages $25,000" and that in the event of an acceptance of such amount by Northeastern, it would be deemed to be "adequate and reasonable compensation to the University[.]"
In January 2004, six months after signing his contract with Northeastern, at the conclusion of the 2003-2004 football season, Brown told Northeastern’s Athletic Director David O’Brien (O’Brien) that Brown wished to speak to another college (not U. Mass.) from whom Brown claimed to have received an inquiry. O’Brien asked Brown “what it would take” to keep Brown from interviewing with that other college. Brown and O’Brien proceeded to discuss a one-year extension to Brown’s contract, a raise in his and his staffs salaries, and other football program enhancements, and Brown agreed to those terms. Thereupon, Northeastern agreed to grant him a one-year extension to his contract and to enter into a new contract with him through June 2009 with concomitant salary increases.
However, before a contract could be drafted and signed, the Acting Athletic Director of U. Mass., Thorr Bjorn (“Bjorn”), called O’Brien to seek permission to speak to Brown about coaching football at U. Mass. O’Brien notified Bjorn that Northeastern would not grant permission and that Northeastern had a contractual right to prevent such discussions. The next day, O’Brien called Bjorn again and confirmed that O’Brien and Northeastern would not give permission to U. Mass, to speak with Brown.
On Friday evening, Februaiy 6, 2004, Brown called O’Brien and told O’Brien that U. Mass. Athletic Director John McCutcheon had offered him the U. Mass, football coaching job, that he, Brown, had accepted it, and that he then turned it down. Over the weekend of February 7-8, 2004, and although he had told several *444 student football players that the rumors that he was leaving were not true, Brown cleared out his office. On Monday, February 9, 2004, Brown handed his letter of resignation to O’Brien, and O’Brien said that Northeastern would do what it needed to do to protect its legal rights.
Thereupon, U. Mass, issued a press release around 5:30 p.m. on Monday, February 9, 2004, to notify the newspapers and media outlets that it hired and signed Brown to be the new football coach at U. Mass. U. Mass, is a member of the same football conference as Northeastern, and the teams play each other every year. Northeastern’s entire football program and its playbook will be available to U. Mass. Their recruitment practices and methods will be known to U. Mass. These two universities compete with each other in the same league, compete for fans to attend their games, compete for media coverage, compete for many of the same football recruits, and compete with each other for television to cover their games on a regional basis. There should be no doubt that college sports and the revenue that they draw are a major business for a university. At times, at some universities, football and basketball programs appear to be more important than the universities’ duty to educate and their duty to instill in college students basic concepts of ethical conduct and adherence to legal and moral obligations.

DISCUSSION

There appears to the Court that there is no question that Brown willfully and intentionally breached his contract with Northeastern. He signed his contract and straight-out violated it. He gave his word to Northeastern and the student athletes that he was not leaving Northeastern when in fact, within a day, he was cleaning out his room to move to U. Mass. Unfortunately for Northeastern, its student athletes, and its football program, Brown’s word was no good and his promises were lies. There also appears to be no question that U. Mass, actively induced the breach when it had been told of the restrictions on Brown’s talking to other potential football employers and of his existing long-term contract with Northeastern.
At the hearing on these motions, counsel for Brown attempted to justify his client’s actions by asserting that “everyone in collegiate football does this” and “what is the big deal?”
Well, a contract is a contract for major universities, just as it is for the rest of the world. This issue was discussed in detail in New England Patriots v. University of Colorado, 592 F.2d 1196 (1st Cir. 1979). That case involved the then Patriots head coach, Charles “Chuck” Fairbanks who decided unilaterally to breach his contract with the Patriots and to become the football coach for the University of Colorado. Id. at 1198. After an extensive discussion of Mr. Fairbanks’ “explanations” for his breach of the contract and his word, the Court stated:
Whatever may be thought rules elsewhere, the legal rules are clear. A contract is not avoided by crossed fingers behind one’s back on signing, nor by unsupported and at once inconsistently self-deprecating and self-serving protests that the breach was to the other party’s benefit.
Id. at 1199; see also Boston Prof'l Hockey v. Cheevers, 348 F.Sup. 261, 265 (1972).
Both defendants raise the issue that Article IX of the Contract contains a liquidated damage clause in the event that Brown leaves before the Contract is completed. The defendants claim that the $25,000 contained in the liquidated damage clause is all to which Northeastern is entitled. However, such a position runs counter to well-established Massachusetts case law. In Rigs v. Sokol, 318 Mass. 337, 342-43 (1945), the Court held that specific performance or an injunction may be granted to enforce a duty even though there is a provision for liquidated damages for breach of that duty.
This result is reached on the assumption that the parties ordinarily contemplate that the contract be performed and that the provision for a penalty or liquidated damages in the event of a breach is intended as security for performance and not as a price for the privilege of nonperformance A contract, of course, may provide for the payment of a fixed sum as an alternative to performance. [WJhether such a provision is merely security for the performance of the contract or an alternative to its performance depends upon the intention of the parties to be deduced from the whole instrument and the circumstances.
Id. at 343.
In this case, there is absolutely nothing to indicate that the liquidated damage clause in Article IX was intended as an alternate to performance. While Article IX does state that in the event of an acceptance of such amount by Northeastern, it would be deemed to be “adequate and reasonable compensation to the University!,]” Article IX deals with the money losses to Northeastern in the event Brown would leave as football coach. It appears to the Court that Article IX does not in any way prohibit injunctive relief, and merely deals with financial payments for money losses incurred by Brown for leaving the University and breaching the contract. Or, as stated in Restatement (Second) of Contracts, §361: “Specific performance or an injunction may be granted to enforce a duty even though there is a provision for liquidated damages for breach of that duty.”
Therefore, assuming that Brown breached his contract the Court must consider whether the circumstances warrant the issuance of injunctive relief. The test for issuance of a preliminary injunction is set out in Package Indus. Group v. Cheney.
*445 [T]he judge initially evaluates in combination the moving party’s claim of injury and chance of success on the merits. If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits.
380 Mass. 609, 617 (1980) (footnote omitted).
Here, there is strong evidence of irreparable harm to be sustained by Northeastern and its football program. Brown knows the program, the plays, and the set procedures used at Northeastern, and he will be able to use his knowledge of same against Northeastern. Northeastern and U. Mass, compete to recruit the same student athletes and compete with each other on a regional basis for television coverage for their games. As noted, U. Mass, and Northeastern are members of the same football conference, and they play each other each year. There is a strong showing of irreparable harm by Northeastern just as there was to the Patriots in New England Patriots, 592 F.2d at 1199.
Further, Northeastern has shown indisputably that it is likely to prevail on the merits. The breach of contract is as clear as it was by Mr. Fairbanks in New England Patriots. See id. at 1198.
On the other hand, the harm to Brown would be that he would not be able to be the football coach at U. Mass. The harm to U. Mass, would be that it would not be able to employ Brown as its football coach. The breach of contract by Brown was and is obvious, brazen, and defiant. U. Mass., as the Commonwealth’s premier higher educational institution was and is so callous in its duty to provide ethical and moral values for its students. The persons from U. Mass, involved in this episode have clearly violated the law but above all else have brought great shame on themselves and the university. This Court finds that the irreparable harm suffered by Northeastern and its probable chance of success on the merits far outweigh the irreparable harm, if any, to Brown or U. Mass, and their negligible chance, if any, to prevail in this case.
After consideration, it appears to the Court that at this time, an injunction directed to the defendant, Donald A. Brown, Jr., will suffice to achieve the result needed in this case. A preliminary injunction will not at this time issue directed to U. Mass., and said request is denied without prejudice. A preliminary injunction will issue to the defendant, Donald A. Brown, Jr.

ORDER

The defendant, Donald A. Brown, Jr., is ORDERED to cease, desist, and refrain from working as an employee, consultant, aide, assistant or in any other capacity for the defendant, University of Massachusetts until further order of this Court.
The request for a preliminary injunction directed to the University of Massachusetts is DENIED without prejudice.