TRUMP VILLAGE SECTION 3, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Trump Village Section 3 v. Commissioner
Docket No. 13569-88
United States Tax Court
T.C. Memo 1995-281; 1995 Tax Ct. Memo LEXIS 282; 69 T.C.M. (CCH) 2985; June 22, 1995, Filed *282 An order will be issued denying the motion for leave to file brief as Amicus Curiae and decision will be entered for petitioner. For petitioner: Mark A. Levy and Jay R. Fialkoff, For respondent: Victoria Wilson Fernandez and Rose E. Gole. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: TYE
Deficiency
Mar. 31, 1982
$ 128,406
Mar. 31, 1983
161,351
Mar. 31, 1984
171,183
Mar. 31, 1985
156,598
The issue for decision is whether section 277 applies to petitioner with the result that the interest income realized by petitioner during each of the years in issue, including the interest earned on various reserve and escrow accounts required under State law, cannot be offset by operating expenses and net operating loss (NOL) carryovers. All section and subchapter references are to the Internal Revenue Code, as amended, unless stated otherwise. At the outset, we note that a Motion For Leave To File Brief As Amicus Curiae was filed by Hillman Housing Corp. and Seward Park Housing Corp. Respondent objects to the motion on the grounds that the movants, two housing corporations, *283 have an interest in the outcome of this proceeding inasmuch as they have filed similar petitions of their own, and that the amicus brief which they seek to file addresses issues that are outside the scope of the issues raised by the parties. The issue whether to grant the privilege of being heard as an amicus is a matter within the discretion of the court. See Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir. 1982); Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970); Erwin v. Commissioner, T.C. Memo. 1986-474; Leigh v. Engle, 535 F. Supp. 418 (N.D. Ill. 1982). In exercising that discretion, the court takes into account whether or not the proffered information is timely, useful, or otherwise helpful. Leigh v. Engle, supra at 420. In this case, the post-trial briefs filed by the parties sufficiently address the issues before the Court and make submissions by petitioners in other cases unnecessary. Accordingly, we will deny the Motion For Leave To File Brief Amicus Curiae. FINDINGS OF FACT Some of the facts have been stipulated *284 by the parties and are so found. The Stipulation For Trial, the Second Stipulation For Trial, and the exhibits attached thereto are incorporated herein by this reference. At the time the subject petition was filed, petitioner maintained its principal office in Brooklyn, New York. Organization of Petitioner
Petitioner was incorporated on August 29, 1961, as a limited profit housing company, pursuant to the provisions of Article XII of the Public Housing Law of the State of New York, now superseded by Article II of the Private Housing Finance Law of the State of New York, commonly referred to as the Mitchell-Lama Law. N.Y. Priv. Hous. Fin. Law art. II (McKinney 1991 & Supp. 1995). During the years in issue, petitioner was subject to the supervision and control of the New York State Division of Housing and Community Renewal, the agency charged with the administration of the Mitchell-Lama Law. See id.secs. 32, 32-a. In this opinion, we refer to the New York State Division of Housing and Community Renewal as the Division of Housing or the Division, and we refer to the Commissioner of the New York State Division of Housing and Community Renewal as the Commissioner of *285 Housing. For Federal income tax purposes, petitioner qualified as a "cooperative housing corporation" within the meaning of section 216(b)(1). Petitioner was organized to serve the public purpose expressed in the Mitchell-Lama Law. Generally, the Mitchell-Lama Law was enacted to encourage private enterprise to join with the State of New York and its municipalities in creating housing companies to provide safe and affordable housing for persons and families of low income. Among other policies and purposes, the MitchellLama Law states as follows: It is hereby found that improvement of the physical environment and revitalization of the quality of urban life in such municipalities would be promoted by cooperative action by tenants who are persons or families of low income to acquire ownership of their dwellings and to operate them on a nonprofit basis; that such cooperative undertakings, with their consequent pride and responsibility of ownership, would help to stem the abandonment of deteriorating but structurally sound buildings, which contributes to a substantial loss of much needed housing stock, and would lead to the stabilization and renewal of deteriorating neighborhoods. *286 It is found necessary, in order to assure the feasibility of such cooperative undertakings, to make available to such tenants long-term financing on a favorable basis and tax exemption to enable them to purchase and maintain their dwellings at a reasonable cost. [N.Y. Priv. Hous. Fin. Law sec. 11-a(2-a).] Generally, corporations which qualify under the Mitchell-Lama Law as limited-profit housing companies are eligible for low-interest State financing of their housing projects and for certain real property tax exemptions. Companies that receive such assistance under the Mitchell-Lama Law become subject to regulation and supervision by the Division of Housing. Housing projects undertaken under the Mitchell-Lama Law may be available for occupancy on either a rental or cooperative basis. N.Y. Comp. Codes R. & Reg. tit. 9, sec. 1725-1.1(d) (1963 & Supp. 1995) (hereinafter cited as Div. reg.). As further discussed below, petitioner's housing complex was organized under State law as a cooperative. Petitioner's certificate of incorporation was filed on August 29, 1961, and was amended on December 7, 1962, May 5, 1967, and August 11, 1986. Throughout this opinion, references to petitioner's *287 certificate of incorporation are references to the certificate as in effect during the years in issue. Petitioner's certificate of incorporation states as follows: The Company [petitioner] has been organized to serve a public purpose and it shall be and remain subject to the supervision and control of the Commissioner [Commissioner of Housing], except as otherwise provided in the Act [Article XII of the Public Housing Law of the State of New York, now superseded by Article II of the Private Housing Finance Law of the State of New York], so long as the Act remains applicable to any project of the Company; that all real and personal property acquired by it, and all structures erected by it, shall be deemed to be acquired or erected for the proper effectuation of the purposes of the Act * * * Article I of petitioner's bylaws, as approved at a stockholders meeting in June or July of 1969, states as follows: The object of the corporation is to construct and operate adequate, safe and sanitary housing accommodations for persons of low income, in accordance with cooperative principles, subject to the provisions and limitations of the Limited-Profit Housing Companies Law and the Rules *288 and Regulations promulgated by the Commissioner of Housing and Community Renewal. As contemplated by its certificate of incorporation and bylaws, petitioner borrowed $ 24,390,000 from the New York State Housing Finance Agency and used the money to construct a housing complex on approximately 13.83 acres of land located in Brooklyn, New York. The complex consists of three buildings, with a total of 1,672 apartments, and outdoor parking facilities. In this opinion, we sometimes refer to the housing complex as the project. As evidence of its indebtedness to the New York State Housing Agency, petitioner issued a mortgage note under which it agreed to pay principal and interest on the debt at the times and in the amounts required by certain tax-exempt bonds that were issued by the New York State Housing Finance Agency to finance the loan. In effect, the term of the loan was 40 years and the interest rate was 3.6 percent per year. Petitioner also gave a mortgage to the New York State Housing Finance Agency under which it pledged the project as collateral to secure payment of the bonds. See N.Y. Priv. Hous. Fin. Law sec. 20. During the years in issue, petitioner engaged in the business *289 of owning and operating the project. In doing so, petitioner was governed by, and operated in accordance with, its certificate of incorporation, its bylaws, the Mitchell-Lama Law, and the rules and regulations of the Division of Housing. Article IV of petitioner's certificate of incorporation prescribes that petitioner's "capital stock * * * shall consist of 31,436 shares of the par value of $ 100 each, all of which shall be limited in respect to dividends" The limitation as to dividends is set forth in Article XIII of petitioner's certificate of incorporation as follows: the directors and subscribers of such Company [petitioner] shall be deemed to have agreed that they shall at no time receive or accept from such Company in repayment of their investment in its stock any sums in excess of the par value of the stock, together with such dividends or other compensation as are prescribed by or permitted under the Act [art. II of the N.Y. Private Housing Finance Law], and that, upon dissolution of the Company, any surplus remaining after the payment of all its obligations shall be distributed and disposed of and title to the property may be conveyed in fee, only as prescribed by the *290 Act. Every tenant of petitioner's housing complex was required to be a stockholder of petitioner. In addition, Article IV of petitioner's certificate of incorporation states as follows: Each holder of shares of capital stock entitled to vote shall be entitled to one vote at any and all meetings of stockholders for any and all purposes regardless of the number of shares held by such holder, except as otherwise provided by statute. Petitioner's bylaws require an annual meeting of the stockholders in order to elect directors and to conduct other business. The bylaws also provide for special meetings of the stockholders. Under the bylaws, written notice of all meetings of the stockholders must be provided to every stockholder and to the Commissioner of Housing. The bylaws further provide that, at all meetings of petitioner's stockholders, each stockholder is entitled to one vote, regardless of the number of shares of petitioner's stock held by such person. Article VII of petitioner's certificate of incorporation contains the following provision regarding the number of directors of the corporation: The number of directors of the Company shall be not less than three (3) and not *291 more than fifteen (15), as determined and fixed by the By-Laws of the Company. One additional director may be designated by the Commissioner of Housing and Community Renewal of the State of New York (which said Commissioner in this Certificate of Incorporation is hereinafter referred to as the 'Commissioner'). In the absence of fraud or bad faith said additional director appointed by the Commissioner shall not be personally liable for the debts, obligations or liabilities of the Company. Petitioner's bylaws state that the management of the business of the corporation is in the hands of a board of directors consisting of 15 directors who "must be stockholders in good standing and residing or domiciled in the buildings of the Housing Company" and "one additional director who may be designated by the Commissioner of Housing and Community Renewal." Each candidate for election to the board as a resident director must be nominated by a "petition subscribed to by not less than fifty stockholders residing in the corporation premises representing no less than fifty apartments." Directors serve voluntarily and without compensation. Article V of petitioner's bylaws states as follows: *292 OPERATION OF THE PROJECT AS A COOPERATIVE
Subject to the provisions of statute [the Mitchell-Lama Law], the corporation will operate the premises * * * as a cooperative and, in accordance therewith, shall pay, or allow, as and when determined by the Board of Directors and approved by the Commissioner of Housing and Community Renewal, after the payment of obligations, expenses, taxes and assessments, and the establishment of suitable reserves, a rebate or rebates of rent or carrying charges to each tenant cooperator in proportion to the rental or carrying charges made by him during the period in respect of which such rent rebate or carrying charge or charges are allowed or paid. The monthly rentals or carrying charges paid by the tenant cooperators shall be deemed to be payment on account of their annual rental obligation, which shall be finally determined by the Board of Directors in the light of each year's operating experience, subject, however, in all respects, to the approval of the Commissioner of Housing and Community Renewal. The right to determine the method of management of the Cooperative shall be subject to the approval of the Commissioner of the [sic] Housing and *293 Community Renewal. Termination of Tenancy and Sale of Stock
In the case of a limited profit housing company, like petitioner, that is organized and operated as a cooperative, the Division's regulations set forth a different procedure for the surrender of possession of an apartment by a cooperator than the procedure applicable in the case of a rental tenant. Div. reg. sec. 1727-5.2(b). The Division's regulations take into account the fact that the cooperator is a stockholder of the limited profit housing company and, as such, has certain rights, duties, and responsibilities. Id.
Under Article VII of petitioner's bylaws and subpt. 1727-5 of the Division's regulations, a cooperator who desires to surrender possession of an apartment and to sell his or her shares of stock in petitioner is required to appoint petitioner as the exclusive agent for the sale for a 90-day period. The purchaser of a cooperator's stock is required to be selected from a list of persons who satisfy the income and other eligibility requirements established by the Division's regulations, or who are otherwise acceptable to the Division. If a person designated by petitioner as a qualified purchaser *294 does not buy the shares by the end of the 90-day period, or if petitioner is unable to find a qualified purchaser during that time, the cooperator is free to sell the shares to any person acceptable to petitioner and the Division. In that event, petitioner acts as the intermediary of the transaction, and the purchaser is required to sign an occupancy agreement and to agree to be bound by petitioner's bylaws. If the cooperator is unable to sell the shares within 6 months, then he or she is required to inform petitioner, and petitioner is again given 90 days to find a qualified purchaser. The maximum price for which a cooperator can sell shares of petitioner's stock is limited to the consideration that he or she paid for the shares, plus the amount of any capital assessments and voluntary capital contributions that he or she paid to petitioner, plus a proportionate share of the aggregate amortization of the first mortgage on the apartment project that was paid during the time the cooperator has owned petitioner's stock. Under the bylaws, no shareholder of petitioner can pledge or otherwise encumber any share of stock in petitioner. Occupancy Agreement
In order to lease an *295 apartment in petitioner's housing complex, a person must meet certain criteria set forth in the Division's regulations, see Div. reg. subpts. 1727-1 to 1727-2, and he or she must execute an occupancy agreement with petitioner. See Div. reg. subpt. 1727-3. The occupancy agreement used by petitioner during the years in issue referred to tenants as "cooperators". It required each cooperator to pay "an annual carrying charge", or rent, in equal monthly installments to lease an apartment. A cooperator had no right to occupy any apartment other than the one leased to him or her. The monthly carrying charges for a particular apartment were deemed to be "payments on account of the Cooperator's annual obligations * * * for the Cooperator's proportionate share of the operating costs of the Housing Company." The occupancy agreement provided that the annual obligation of the cooperator for each year shall be finally determined by petitioner's Board of Directors "in light of the year's operating experience." The occupancy agreement specifically provided that petitioner would "pay or allow rebates" to the cooperator in the event that petitioner's revenues exceed operating costs. In this connection, *296 the occupancy agreement states as follows: In the event that the revenues of the Housing Company [petitioner] shall exceed its operating costs, the Housing Company will pay or allow rebates to each Cooperator in the amount of his proportionate share of such excess, such rebates to be paid and allowed in such manner or in such form as from time to time the Board of Directors of the Housing Company with the written approval of the Commissioner of Housing and Community Renewal, shall declare and determine. Petitioner reserved the right to apply to the Commissioner of Housing from time to time for permission to increase the maximum average permissible carrying charges. Under the occupancy agreement, the term "operating cost" is defined as follows: The operating cost of the Housing Company as used herein, shall include all expenses and outlays growing out of or connected with the construction, ownership, maintenance, and operation of the lands and buildings owned by the Housing Company which sum may include, among other things, taxes, assessments, water rents, sewer charges, insurance premiums, operating expenses, professional fees, salaries and wages, the cost of improvements, *297 additions, alterations, replacements, repairs, expenses and liabilities under or by reason of this or other occupancy agreements, interest on mortgage indebtedness, mortgage amortization payments, the payment of any other liens or charges, the payment of any deficit remaining from a previous period, the creation of a reserve fund as may be required and established by the Commissioner of Housing and Community Renewal of the State of New York for depreciation, obsolescence, bad debts or contingent losses or expenses, and expenses for other corporate purposes. The Board of Directors of the Housing Company may include in the operating cost for any year any liabilities or items of expenses which accrued or became payable in a previous year and also any sums which it may deem necessary or prudent to provide as a reserve against liabilities or expenses then accrued or thereafter to accrue. In effect, the term "operating cost" is defined to include all expenses and outlays growing out of or connected with the ownership, maintenance, and operation of the land and buildings owned by petitioner, whether or not the expenses or outlays are deductible for Federal income tax purposes. Combined *298 Budget and Rent Determination Procedure
During each of the years in issue, the Division of Housing had plenary authority to review and approve petitioner's proposed budget and carrying charges in a combined procedure. Div. reg. sec. 1728-1.1(b). The Division's regulations required petitioner to submit to the Division biennially a proposed budget for the succeeding 2-year period. Id. sec. 1728-1.2(a)(1). The Division's regulations at section 1728-1.2(a)(2) set forth the following guidelines for the Division's review of the proposed budget: The division in conducting its analysis shall review opportunities to: (i) maximize revenues, including, inter alia: increasing residential and nonresidential occupancy rates, strengthening the terms of commercial and professional leases, reducing vacated and current arrears, adjusting air conditioning and other ancillary charges, and the prudent investing of available operating cash and reserves; and (ii) reduce projected expenditures, including, inter alia, identifying and eliminating nonrecurring expenses, and achieving cost efficiencies in ongoing expense items. If the Division found that projected revenues for the *299 2-year period were sufficient to fund petitioner's obligations, both current and arrears, without a rent adjustment, it would approve the budget as submitted. Id. sec. 1728-1.2(a)(3). If it found that the projected revenues for the applicable 2-year period were not sufficient to fund all obligations without a rent adjustment, or if the housing company applied for a rent adjustment in connection with its budget submission, then the Division would initiate the rent determination procedure prescribed by the Division's regulations under which an increase of the carrying charges could be approved after appropriate notice to the residents and hearings. See id. sec. 1728-1.2(b). At the end of the first year of each 2-year budget cycle, the Division reviewed the budget in light of "actual experience * * *, the reasonableness of cost estimates in the light of more recent cost trends, and any other relevant factors" and would modify the second-year budget, if necessary. Id. sec. 1728-1.2(c)(1). Review of a budget would take place 165 days prior to the end of the first year of the budget cycle. Id. If the projections made during the review showed a "significant" surplus *300 in the second-year budget, then the Division would issue a modified second-year budget together with an appropriate rent reduction order or, if applicable, an order prescribing a reduced second-step rent increase. Id. sec. 1728-1.2(c)(5). On the other hand, if the projections made during the budget review showed a "significant" deficit in the second-year budget, then the Division was authorized to take certain steps to modify the budget to eliminate the deficit. Id. sec. 1728-1.1(c)(6). A surplus or deficit was "significant" if it exceeded the greater of 1 percent of the annual residential rent roll of the cooperative, or the amount required to fund the "contingency reserve in the second year of the budget cycle." Id. sec. 1728-1.2(c)(3). Petitioner's Facilities
The regulations of the Division of Housing require petitioner to provide facilities such as management and maintenance facilities, storage areas, laundry rooms, and recreational and community facilities. Div. reg. sec. 1711-5.0 to 1711-5.6, 1711-6.13. Petitioner's board of directors was charged with the duty of ensuring that petitioner's buildings, grounds, and other assets were kept up to high standards *301 so that their value was not impaired and that the annual operating expenditures were spent effectively and economically. Div. reg. sec. 1725-2.1(b). Petitioner provided for general maintenance of the buildings and their fixtures, the grounds, elevators, and other common areas. Petitioner maintained an office and staff which oversaw its daily operation. Petitioner paid utility bills, maintained insurance, provided for exterminating services, contracted for coin-operated laundry machines, and paid the mortgage on the building. Petitioner maintained two rooms for its tenant-shareholders for civic and community activities, and private parties, at a fee. Petitioner's Financial Statements
Petitioner's financial statements for the fiscal years in issue show the following revenue and expenses: Fiscal Year Ended
3/31/82
3/31/83
3/31/84
3/31/85
Revenue
Carrying charges
$ 4,789,972 $ 5,063,364 $ 5,063,364 $ 5,766,782
Other rent income
123,245 131,479 128,352 126,957
Other income
553,038 659,408 666,456 343,966
Interest income
321,258 393,967 416,158 384,542
Total revenue
5,787,513 6,248,218 6,274,330 6,622,247
Expenses
Administrative
200,293 200,130 218,958 247,081
Operating
2,890,497 2,981,149 3,408,493 3,532,825
Repairs and
452,388 496,861 523,828 378,725
maintenance
Taxes, interest
1,256,530 1,241,341 1,307,068 1,423,592
and insurance
Depreciation
557,213 552,031 568,355 576,982
Total expenses
5,356,921 5,471,512 6,026,702 6,159,205
Net Income
430,592 776,706 247,628 463,042
Beginning retained
(1,408,848)
(978,256)
(201,550)
46,078
earnings (deficit)
Ending retained
(978,256)
(201,550)
46,078 509,120
earnings (deficit)
Mortgage
487,500 505,000 523,500 542,500
amortization
installments
*302 During the years in issue, every limited profit housing company was required to keep its books and records in accordance with a uniform system of accounts prescribed by the Commissioner of Housing. Div. reg. sec. 17282.1(a). Every housing company was also required to file an annual report with the Division on forms provided by the Division. Id. sec. 1728-2.2(b). The annual reports filed by petitioner with the Division for the years in issue report the same income, expenses, and net profit or loss as is set forth in petitioner's financial statements. Escrow and Reserve Accounts
During the years in issue, the regulations of the Division of Housing required every limited profit housing company to establish and maintain certain escrow and reserve funds. See generally Div. reg. subpt. 1728-2. The Division's regulations provide: All escrow, reserve funds and administrative funds not currently required, shall be invested. Such investments shall have the prior written approval of the division. [Id. sec. 1728-2.4(f).] First, petitioner maintained an "operating escrow fund", as required by section 1728-2.4 of the Division's regulations. Petitioner was required *303 to make monthly deposits into this fund "equal to one twelfth of the estimated annual charges for * * * real estate taxes, water charges, sewer rents and insurance." Id. sec. 1728-2.4(c). The Division's regulations refer to the moneys comprising these deposits as "escrow funds". Id. sec. 1728-2.4(c). Petitioner was also required by the Division's regulations to make monthly deposits into the operating escrow fund in an amount determined by the Division "to cover future painting and redecorating, contingencies, vacancies and collection losses and replacements." Id. sec. 1728-2.4(d). The regulations refer to the moneys comprising these deposits as "reserve funds". Id. sec. 1728-2.4(d). As in effect during the years in issue, the Division's regulations required petitioner to send to the Division a duplicate deposit slip with respect to every deposit to the operating escrow fund and required checks drawn on the operating escrow fund to be countersigned by a duly authorized officer of the Division. See id. sec. 1728-2.4(b). The annual reports filed by petitioner with the Division of Housing for each of the years in issue state that the amounts held in the operating *304 escrow fund were as follows: Operating Escrow Fund
3/31/82
3/31/83
3/31/84
3/31/85
Cash, account 1211
$ 231,153 $ 305,523 $ 369,668 $ 832,563 Accrued interest
account 1212
46,477 81,372 92,590 55,176 Investments,
account 1213
2,453,366 2,754,043 2,775,740 2,296,730 Other
(8,303)
(42,299)
(1,500)
(55,334)
Total
2,722,693 3,098,639 3,236,498 3,129,135 Second, petitioner maintained a "development escrow fund", as required by section 1728-2.3 of the Division's regulations. This fund included development funds that were escrowed to meet specific development liabilities. Div. reg. sec. 1740.1 (description of account 1220). Disbursements from this fund were not permitted without the prior written approval of the Division, and checks drawn on the bank account comprising the fund were required to be countersigned by a representative of the Division. With approval by the Division, moneys in the fund could be invested in such short-term securities as were designated by the Division. Div. reg. sec. 1728-2.3(c). The annual reports filed by petitioner with the Division of Housing for each of the years in issue state that the amounts *305 held in the development fund were as follows: Development Escrow
3/31/82
3/31/83
3/31/84
3/31/85
Fund
Cash, account 1221
$ 1,702
$ 7,343
$ 11,208
$ 7,528
Accrued interest,
account 1222
1,264
3,225
687
1,236
Investment,
account 1223
62,278
64,358
68,544
78,679
Total
65,244
74,926
80,439
87,443
Third, petitioner maintained an "administration fund", as required by sec. 1728-2.5 of the Division's regulations. Petitioner sometimes referred to this fund as "administrative fund". Petitioner was required to deposit all rent receipts and other miscellaneous operating income into the fund and was required to disburse all expenses for current operations from the fund. The annual reports filed by petitioner with the Division of Housing for each of the years in issue state that the amounts held in the administrative funds were as follows: Administrative Fund
3/31/82
3/31/83
3/31/84
3/31/85
Cash, account 1113
$ 199,430
$ 120,742
$ 73,619
$ 14,493
Accrued interest, account 1150
--   --  6,780
--  Investments, account 1120
--   379,007
315,657
154,466
Total
199,430
499,749
396,056
168,959
In addition to the above *306 escrow and reserve funds, petitioner was required by the mortgage that it issued to the New York State Housing Finance agency to establish a mortgage escrow fund. See N.Y. Priv. Hous. Fin. Law sec. 22. Under the terms of the mortgage, petitioner was required to deposit into the mortgage escrow fund, at the times and in the amounts scheduled by the mortgagee, the New York State Housing Finance Agency, the moneys necessary to pay interest and principal on the mortgage. The mortgage further provides that no withdrawals were permitted from the mortgage escrow fund, except for the purpose of paying principal and interest on the mortgage. Petitioner made monthly contributions to the mortgage escrow fund in an amount needed to make payment of the principal and interest on the mortgage. The money in the escrow account could be invested by the escrow agent "in direct obligations of the United States of America", and, during the years in issue, the moneys were invested in U.S. Treasury obligations. The annual reports filed by petitioners with the Division of Housing for each of the years in issue state that the amounts held in the mortgage escrow fund were as follows: Mortgage Repayment Fund 3/31/82
3/31/83
3/31/84
3/31/85
Cash, account 1231
$ 16,268
$ 13,905
$ 17,612
$ 16,513
Accrued interest,
account 1232
--  10,656
13,040
14,061
Investments, account 1233
583,727
565,961
562,502
563,507
Total
599,995
590,522
593,154
594,081
*307 For fiscal years 1982 through 1985, petitioner's financial statements and annual reports to the Division of Housing report that petitioner received interest income in the following amounts: Interest Income
3/31/82 3/31/83 3/31/84 3/31/85 Operating Escrow
$ 229,368
$ 309,137
$ 324,119
$ 315,756
Fund
Mortgage Repayment
67,238
47,080
40,522
44,751
Fund
Development Escrow
4,856
9,682
[1] 5,515
7,006
Fund
Administration Fund
19,290
13,331
45,261
16,387
Miscellaneous
506
14,737
741
642
321,258
393,967
416,158
384,542
Petitioner reported the above amounts on its U.S. Corporation Income Tax Return Form 1120 for fiscal years 1982, 1983, 1984, and 1985. We note that the parties have stipulated that the correct amounts of interest income reported by petitioner are $ 321,258, $ 393,967, $ 416,158, and $ 384,452 (sic). We also note that the record of this case does not explain the nature of the miscellaneous interest reported by petitioner. The Controversy
For Federal income tax purposes, petitioner used the *308 accrual method of accounting and reported income on the basis of a fiscal year ending March 31. On its tax returns for fiscal years 1982, 1983, 1984, and 1985, petitioner reported the following total income, total deductions, taxable income before net operating loss carryover deductions, and taxable income: Fiscal Year
3/31/82
3/31/83
3/31/84
3/31/85
Total income
$ 5,134,305 $ 5,637,254 $ 5,961,987 $ 6,517,275 Total deductions
5,356,921 5,471,512 6,026,702 6,159,205 Taxable income
before NOL
(222,616)
165,742 (64,715)
358,070 NOL
(2,662,211)
(2,553,373)
(2,387,631)
(2,452,346)
Taxable income
(2,884,827)
(2,387,631)
(2,452,346)
(2,094,276)
Respondent determined that section 277 applies to petitioner. Respondent's notice of deficiency states as follows: It is determined that the interest income reported by you in the amount of * * * [$ 321,258, $ 393,967, $ 416,158, and $ 384,542] for the years March 31, 1982, March 31, 1983, March 31, 1984 and March 31, 1985, respectively, constitutes non-membership income. Pursuant to I.R.C. Section 277, your deductions attributable to furnishing services, insurance, goods or other items of *309 value to members are allowable only to the extent of membership income as determined and as computed below: 31/31/82
3/31/83
Total income reported
$ 5,134,305
$ 5,637,254
Less: non membership income
Interest income
321,258
393,967
Membership income
4,813,047
5,243,287
Deductions attributable to
membership activities
5,356,921
5,471,512
Net operating loss-carryover
2,662,211
2,553,373
Total deductions claimed
8,019,132
8,024,885
Total deductions allowed
to the extent of membership
income
4,813,047
5,243,287
Adjustment
3,206,085
2,781,598
3/31/84
3/31/85
Total income reported
$ 5,961,987
$ 6,517,275
Less: non membership income
Interest income
416,158
384,452
[sic]
Membership income
5,545,829
6,132,823
Deductions attributable to
membership activities
6,026,702
6,159,205
Net operating loss-carryover
2,387,631
2,452,346
Total deductions claimed
8,414,333
8,611,511
Total deductions allowed
to the extent of membership
income
5,545,829
6,132,823
Adjustment
$ 2,868,504
2,478,728
Therefore, your taxable income is increased by $ 3,206,085, $ 2,781,598, $ 2,868,504, and $ 2,478,728 for the tax years ending *310 March 31, 1982, March 31, 1983, March 31, 1984, and March 31, 1985, respectively.
We note that the taxable income before NOL reported by petitioner on its income tax return for each of the years in issue is less than the net income reflected on petitioner's financial statement and is less than the net profit reported on petitioner's annual report to the Division of Housing. For tax purposes, petitioner reported gross rents that are less than the sum of the carrying charges and other rental income that petitioner used for financial reporting purposes. The difference between the two for each of the years in issue is set out below: Gross Rents
3/31/82
3/31/83
3/31/84
3/31/85
Financial
$ 4,913,217
$ 5,194,843
$ 5,191,716
$ 5,893,739
statements
Tax returns
4,260,009
4,583,879
4,879,373
5,788,767
Difference
653,208
610,964
312,343
104,972
It appears that the difference in each of the subject years is due to the fact that for tax purposes petitioner reduced gross rents by the amount of its net contributions to certain reserves. Respondent has not raised an issue about this difference. OPINION The issue in this case is whether petitioner is subject to section *311 277. That section provides as follows: SEC. 277(a). General Rule. -- In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members (including income derived during such year from institutes and trade shows which are primarily for the education of members). If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year. The deductions provided by sections 243, 244, and 245 (relating to dividends received by corporations) shall not be allowed to any organization to which this section applies for the taxable year. (b) Exceptions. -- Subsection (a) shall not apply to any organization -- (1) which for the taxable year is subject to taxation under subchapter H or L, (2) *312 which has made an election before October 9, 1969, under section 456(c) or which is affiliated with such an organization, (3) which for each day of any taxable year is a national securities exchange subject to regulation under the Securities Exchange Act of 1934 or a contract market subject to regulation under the Commodity Exchange Act, or (4) which is engaged primarily in the gathering and distribution of news to its members for publication. In effect, section 277(a) requires a social club or other membership organization to separate income and deductions into two categories or baskets, one for membership income and deductions and one for nonmembership income and deductions. See Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 567 (1994). As to the first basket, section 277 provides that membership deductions (i.e., "deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members") shall be allowed only to the extent of membership income (i.e., "income derived during such year from members or transactions with members"). It further provides that any excess of membership deductions *313 over membership income shall be treated as a membership deduction paid or incurred in the succeeding taxable year. Thus, section 277 prohibits the taxpayer from using excess membership deductions to offset nonmembership income. This has the effect of preventing a social club or other membership organization from avoiding tax on nonmembership income by operating membership activities at a loss and using the loss to offset nonmembership income. Concord Consumers Housing Co-op v. Commissioner, 89 T.C. 105, 116-117 (1987); Associated Master Barbers & Beauticians of America, Inc. v. Commissioner, 69 T.C. 53, 72 (1977); see Armour-Dial Men's Club, Inc. v. Commissioner, 77 T.C. 1, 8 (1981), affd. 708 F.2d 1287 (7th Cir. 1983). Respondent takes the position that section 277 applies to petitioner. In the subject notice of deficiency, respondent treated the interest that petitioner earned during each of the years in issue, including the interest earned on the subject escrow and reserve accounts, as "nonmembership income". Respondent treated petitioner's other income *314 as "membership income" and treated all of petitioner's deductions as "membership deductions". Thus, for purposes of section 277, respondent determined that petitioner had realized net nonmembership income in each of the subject years, consisting of the aggregate interest earned during the year, and that petitioner had realized excess membership deductions in each of the subject years. Accordingly, the adjustment made by respondent in the notice of deficiency was to disallow the excess membership deductions in each of the years in issue (i.e., $ 3,206,085, $ 2,781,598, $ 2,868,504, and $ 2,478,728). The effect of this adjustment is to cause petitioner to pay income tax on its "nonmembership income" consisting of the interest earned during each year (i.e., $ 321,258, $ 393,967, $ 416,158, and $ 384,542). We note that the parties have stipulated that petitioner had incurred bookkeeping and accounting expenses of $ 3,213, $ 3,940, $ 4,162, and $ 3,845 during fiscal years ending March 31, 1982, 1983, 1984, and 1985, respectively, which are attributable to the interest earned by petitioner during those years. On brief, respondent concedes that petitioner is entitled to treat those expenses *315 as nonmembership deductions and, accordingly, to reduce the adjustment set forth in the notice of deficiency for each of the subject years by those amounts. Petitioner makes three principal arguments in support of its position that respondent erred in the notice of deficiency. First, petitioner contends that section 277 does not apply because it is not a "membership organization" within the meaning of section 277(a). Petitioner asserts that it is a Mitchell-Lama housing cooperative and that, for Federal tax purposes, it qualifies as a "cooperative housing corporation", as described in section 216(b)(1). Petitioner argues that it has "stockholders", not "members", that it charges "rent", not "membership fees", and that it primarily provides "housing", not "services or goods". In this connection, petitioner also argues that the application of section 277(a) to a cooperative housing corporation, described in section 216(b)(1)(C), would operate as a "penalty tax" that was not intended by Congress. Second, petitioner argues that it is operated "on a cooperative basis", within the meaning of that phrase as used in section 1381(a)(2), and is governed by the provisions of subchapter *316 T, as a matter of law. Petitioner further argues that, if an entity is subject to the provisions of subchapter T, then it is not subject to section 277 because the provisions of subchapter T preempt the application of "the more general rules of section 277". Third, petitioner argues that, even if section 277 applies, there is no deficiency. According to petitioner, the subject interest income should be classified as membership income for purposes of section 277 and, as such, the interest is eligible to be offset by an equivalent amount of petitioner's operating expenses and net operating loss carryovers that respondent disallowed as excess membership deductions. Recently, in Buckeye Countrymark, Inc. v. Commissioner, supra, we considered the premise underlying petitioner's second argument, whether section 277(a) applies to nonexempt cooperatives subject to subchapter T. We found "that the provisions of section 277 conflict with the provisions of subchapter T and that the application of section 277 to nonexempt cooperatives would lead to absurd or futile results." Id. at 581. Accordingly, We held that Congress *317 did not intend section 277 to apply to nonexempt cooperatives subject to tax under subchapter T. Id.; see also Landmark, Inc. v. United States, 25 Cl. Ct. 100 (1992). Based upon our opinion in Buckeye Countrymark, Inc. v. Commissioner, supra, we agree with the premise of petitioner's second argument that if an entity is subject to the provisions of subchapter T, then it is not subject to section 277. If we find that petitioner is a cooperative subject to the provisions of subchapter T, then we must decide this case for petitioner. Therefore, the narrow issue for decision in this case is whether petitioner is a cooperative subject to subchapter T. Section 1381(a) specifies the organizations that are subject to subchapter T. That subsection states as follows: SEC. 1381(a). In General. -- This part shall apply to -- (1) any organization exempt from tax under section 521 (relating to exemption of farmers' cooperatives from tax), and (2) any corporation operating on a cooperative basis other than an organization -- (A) which is exempt from tax under this chapter, (B) which is subject to the provisions of -- *318 (i) part II of subchapter H (relating to mutual savings banks, etc.), or (ii) subchapter L (relating to insurance companies), or (C) which is engaged in furnishing electric energy, or providing telephone service, to persons in rural areas. It is evident that petitioner does not fall within section 1381(a)(1), the first of the two categories of entities subject to subchapter T, because it is not a farmers' cooperative and, accordingly, cannot qualify under section 521 as an exempt cooperative. Our focus is whether petitioner qualifies under section 1381(a)(2), "any corporation operating on a cooperative basis", a so-called nonexempt cooperative. If a corporation is "operating on a cooperative basis" within the meaning of section 1381(a)(2), then the provisions of subchapter T attach, and the corporation is governed by those provisions as a matter of law. Concord Consumers Housing v. Commissioner, 89 T.C. at 126 (Korner, J., concurring). The application of subchapter T is not elective. See Concord Village, Inc. v. Commissioner, 65 T.C. 142 (1975); Park Place, Inc. v. Commissioner, 57 T.C. 767 (1972); *319 Farmers Union Mktg. & Processing Association v. United States, 77-1 USTC par. 9213, 39 AFTR 2d 77-963 (D. Minn. 1977). Neither subchapter T nor the regulations promulgated thereunder define the phrase "operating on a cooperative basis" as used in section 1381(a)(2). In Puget Sound Plywood, Inc. v. Commissioner, 44 T.C. 305 (1965), we surveyed the history and characteristics of cooperative associations and identified the following three guiding principles which form the core of economic cooperative theory: (1) Subordination of capital, both as regards control over the cooperative undertaking, and as regards the ownership of the pecuniary benefits arising therefrom; (2) democratic control by the worker-members themselves; and (3) the vesting in and the allocation among the worker-members of all fruits and increases arising from their cooperative endeavor (i.e., the excess of the operating revenues over the costs incurred in generating those revenues), in proportion to the worker-members' active participation in the cooperative endeavor. [Id. at 308.] In Puget Sound Plywood *320 , the taxpayer had been organized by workers to build and operate a plant for the manufacture and sale of plywood and related wood products. In that case, the Court reviewed the State law under which the taxpayer was organized, the taxpayer's articles of association and bylaws, and the operation of the taxpayer during the years in issue. The Court found that the taxpayer "was formed, incorporated, and operated by the worker-members on a cooperative basis, for their mutual benefit in producing and marketing plywood and related wood products" Id. at 317-318. Accordingly, the Court concluded that the taxpayer should be regarded for Federal income tax purposes as a "nonexempt cooperative association" and was entitled to exclude from taxable income the patronage dividends which were allocated during the taxable years involved. Id. at 318. In order to achieve the first principle of economic cooperative theory, subordination of capital, the Court in Puget Sound Plywood, stated that limitations must be imposed upon the amounts that can be distributed with respect to the cooperative's stock, and control over the management *321 and direction of the cooperative must be vested in the members of the cooperative, as opposed to its stockholders. See id. at 308. In order to achieve the second principle, democratic control, the Court stated that the members of the cooperative must "themselves periodically assemble in democratically conducted meetings at which each member has one vote and one vote only" to consider and resolve problems affecting the conduct of the cooperative. Id. In order to achieve the third principle, operation at cost, the Court stated that the elected officers of the cooperative must be required "through statutes, bylaws, and contractual arrangements" to make "periodic allocations of the * * * [margins] among the members in proportion to their active participation as workers." Id.
Based upon our review of all of the facts and circumstances of this case, we find that during the years in issue petitioner adhered to the three characteristics of a cooperative association as described in Puget Sound Plywood, Inc. v. Commissioner, supra, and that petitioner was operating on a cooperative basis within the meaning of section *322 1381(a)(2). In the following discussion, we highlight some of the facts which form the basis of our conclusion that petitioner possessed the characteristics of a cooperative, and we discuss respondent's position as to each of the three characteristics. Subordination of Capital
It is evident that, during the years in issue, control over petitioner's operations was in the hands of petitioner's tenants by reason of their position as tenants in petitioner's housing project. See id. at 308. Pursuant to the occupancy agreement that all tenants were required to execute, every tenant in petitioner's housing project was required to own shares of petitioner's capital stock. The management of petitioner's business was in the hands of petitioner's board of directors, consisting of 16 members. Fifteen members of the board were elected by the stockholders and were required to be residents of the project. One additional director was designated by the Commissioner of Housing. The bylaws required each of the fifteen resident directors to be nominated "by petition subscribed to by not less than fifty stockholders residing in the corporation premises representing *323 no less than fifty apartments." Moreover, it is evident that the pecuniary benefits that could arise from holding petitioner's stock were limited and subordinate. See id. As discussed in the findings of fact, the participation of petitioner's stockholders in any current earnings of the corporation is limited under Article XIII of petitioner's certificate of incorporation to "such dividends or other compensation as are prescribed by or permitted under the [Mitchell-Lama] Act." See N.Y. Priv. Hous. Fin. Law sec. 28, for a provision restricting the payment of dividends from earnings. Similarly, Article XIII of petitioner's Certificate of Incorporation prescribes that upon petitioner's dissolution the distribution of any surplus and the distribution of property shall take place "only as prescribed by the [Mitchell-Lama] Act." See N.Y. Priv. Hous. Fin. Law sec. 35, for a provision regarding the voluntary dissolution of a company subject to the Mitchell-Lama Act; see also Div. reg. pt. 1750. Finally, as discussed in greater detail above, Article XIII of petitioner's certificate of incorporation places restrictions on the transfer of petitioner's stock and the amount that a stockholder *324 could receive upon the sale of his or her stock. See also Div. reg. subpt. 1727-5. Democratic Control
Petitioner is democratically controlled by the tenants who reside in petitioner's housing project. See Puget Sound Plywood, Inc. v. Commissioner, 44 T.C. at 308. As mentioned above, every tenant is required by the occupancy agreement to own shares of petitioner's capital stock. Article II of the bylaws requires an annual meeting of the stockholders to elect directors and to transact other business of the corporation. Article II of the bylaws also permits special meetings of the stockholders for any purpose or purposes. At all meetings of the stockholders, each stockholder is entitled to one vote, regardless of the number of shares held by the stockholder. With certain limited exceptions, petitioner's bylaws require written notice of the annual meeting and every special meeting to be given to each stockholder entitled to vote. Respondent denies that petitioner is democratically controlled because of the "involvement [of the Division of Housing] in petitioner's activities." Respondent makes the following argument: The DHCR [Division of *325 Housing] controls every critical aspect of petitioner's operation. A representative of the DHCR sits on the Board of Directors of petitioner; the DHCR must authorize in writing the payment of any rebates to the tenant shareholders; and the DHCR must approve petitioner's projected budget. Consequently, every important decision made by petitioner's Board of Directors must be approved by the DHCR, and petitioner's contention that it is democratic is questionable. The policy of the Mitchell-Lama Law is to assist "persons or families of low income to acquire ownership of their dwellings and to operate them on a nonprofit basis". N.Y. Priv. Hous. Fin. Law sec. 11-a(2-a). The Mitchell-Lama Law requires the Division of Housing to supervise each housing company with respect to its operation of projects financed under the law primarily to protect the public interest in obtaining repayment of the mortgage loans made to each housing company and in preserving the project as collateral for the loan. See id.secs. 20 to 22, 23-a, 25 to 26, 27 to 29, 32. Based upon our review of the Mitchell-Lama Law and the Division's regulations, we find no basis to conclude that the purpose or effect *326 of the Division's supervision is to take away the control that tenants exercise over housing projects financed under the law. To the contrary, the Mitchell-Lama Law and the Division's regulations contemplate that some housing companies, like petitioner, will be "mutual companies" and will make dwellings available for occupancy on a cooperative basis. See id. sec. 12(2-b); Div. reg. sec. 1725-1.1(d). Furthermore, the Division's regulations are designed to assure that tenants are consulted by the housing company and are given financial and other information to be informed about the operation of the company. See N.Y. Priv. Hous. Fin. Law sec. 32-a. Operation at Cost
As discussed above, the Division's regulations establish a combined procedure under which a housing company submits its proposed operating budget and carrying charges to the Division for review and approval at the same time. Div. reg. subpt. 1728-1. Under that procedure, the housing company is required to take an operating deficit or surplus into account in setting future budgets and carrying charges. Furthermore, if an operating surplus does arise, Article V of petitioner's bylaws and petitioner's occupancy *327 agreement provide that petitioner shall pay or allow a rebate to its tenants in proportion to the rent or carrying charges paid by the tenant. Based upon petitioner's bylaws, occupancy agreement, and the Division's regulations, we believe that "all fruits and increases" from the operation of petitioner's housing project are vested in the tenants in proportion to the tenant's proportionate contribution. Puget Sound Plywood, Inc. v. Commissioner, 44 T.C. at 308. Thus, we find that petitioner was operated at cost. Respondent concedes that petitioner was obligated under its bylaws and occupancy agreement "to rebate rent or carrying charges to each tenant-shareholder in proportion to his or her contribution in the event that revenues exceed operating cost." According to respondent, petitioner "disregarded the provision in its by-laws and the occupancy agreement" by failing to make a "cash distribution" to its cooperators. Respondent emphasizes that "no patronage dividends were ever made during petitioner's existence." In this connection, respondent notes that, during the years in issue, petitioner filed no information returns pursuant to section 6044(a), *328 which requires cooperatives subject to subchapter T to report patronage dividends in excess of $ 10, and petitioner furnished no Forms 1099 PATR regarding patronage distributions to its patrons. Respondent also argues that petitioner "did not contemplate that the provisions of subchapter T would apply." In support of this argument, respondent points to the fact that "petitioner maintained no records allocating net earnings among the tenant-shareholders, nor did petitioner maintain any tenant files." Furthermore, respondent asserts that "petitioner prepared no records or patronage allocation worksheets evidencing its characterization of current earnings and liabilities and net operating losses as patronage or nonpatronage sourced, nor did petitioner separate its income and expenses between patronage-sourced and nonpatronage sourced." Respondent does not address whether the unified budget and rent determination procedure required under the Division's regulations has the effect of assuring that petitioner operates at cost. Respondent argues that "theoretical distribution such as reduced increases in the carrying charges, [cannot] constitute patronage dividends within the meaning of *329 section 1388(a)." According to respondent, "Congress did not envision the application of subchapter T where there is no measurable and taxable benefit either at the level of the cooperative or the patron." Finally, respondent argues that it is "unclear" whether a company that is subject to the Mitchell-Lama Law is truly operated at cost as regarded by Puget Sound Plywood, Inc. v. Commissioner, supra. The thrust of this argument is respondent's contention that "petitioner does not operate at a true market cost, but an artificial level" by reason of the favorable mortgage rates and tax exemptions provided by the State of New York. Additionally, respondent contends that petitioner's tenant-shareholders do not pay the costs incurred by petitioner because "the carrying charges are based on a projected budget approved by the DHCR [Division of Housing], which analyzes opportunities to maximize revenue through prudent investment, and [to] reduce expenditures by achieving cost efficiency." According to respondent, the system of financial control of housing companies under the Mitchell-Lama Law "does not seem to be consistent with the concept that financial *330 control of a cooperative must vest in its cooperators." At the outset, we observe that the issue in this case is whether petitioner was "operating on a cooperative basis" during each of the years of issue within the meaning of section 1381(a)(2). In order to answer that issue, we have reviewed the facts and circumstances of this case and we have found that during each of the years in issue, petitioner satisfied each of the three guiding principles of economic cooperative theory identified by the Court in Puget Sound Plywood, Inc. v. Commissioner, supra at 308. The issue in this case is not whether petitioner's method of distributing any excess of revenues over operating costs qualifies as a "patronage dividend", defined by section 1388(a). In considering whether petitioner operated at cost, respondent confuses the issue and fails to take into account the effect of the combined budget and rent determination procedure, required by the Division's regulations, on petitioner's operation. The principal thrust of respondent's argument is that petitioner failed to make "any rebates during the years at issue, nor at any time since petitioner's inception." *331 Respondent notes that petitioner realized taxable income before NOL's in the amounts of $ 165,742 in 1983 and $ 358,070 in 1985. Respondent points out that "no amount of this income was returned to the cooperators of petitioner as a cash distribution", and concludes that petitioner disregarded its bylaws and occupancy agreement. Respondent also notes that petitioner's retained earnings for fiscal years 1984 and 1985 equaled $ 46,079 and $ 509,121, respectively, and none of those amounts were allocated among the tenant-shareholders. We agree with respondent that if a corporation realizes net earnings and fails to distribute them, in contravention of a requirement to do so, that is evidence that the corporation is not a cooperative. See Brookings Plywood Corp. v. United States, 78-1 USTC par. 9103, 40 AFTR 2d 77-6119 (D. Ore. 1977). At the same time, however, a corporation may be operating on a cooperative basis even though no payments are made to its members with respect to the year. See Farmers Union Mktg. & Processing Association v. United States, 39 AFTR 2d 77-963, 77-1 USTC par. 9213 (D. Minn. 1977). *332 The test is not whether actual payments are made but whether the cooperative is legally obligated to return the "fruits" of the cooperative endeavor to its members. Id.
In this case, petitioner was not obligated to distribute taxable income before net operating losses to its tenant-shareholders, nor was it obligated to distribute retained earnings to its tenant-shareholders. During each of the subject years, petitioner was obligated by the combined budget and rent determination procedure to operate at cost. The Division's regulations required petitioner to take any surplus or deficit of projected income and expenses into account in establishing its budget and carrying charges for the next budget cycle. See Div. reg. sec. 1728-1.2. In this manner, a projected budget surplus for the current period was "disbursed" to petitioner's shareholder-tenants in the form of reduced carrying charges. We note that in Concord Village, Inc. v. Commissioner, 65 T.C. 142 (1975), the taxpayer was a not-for-profit housing cooperative incorporated under Arizona law, pursuant to section 221(d)(3) of the National Housing Act, 12 U.S.C. sec. 1715 *333 1(d)(3). Our opinion in that case notes that the taxpayer's bylaws and occupancy agreements with its members were in accord with Federal regulations set forth in 24 C.F.R. sec. 221.534(b) (1966-68) which allowed "'surplus funds'" [to] be "'disbursed to members in the form of reduced carrying charges or reduced sales prices of the dwelling accommodations, or patronage refunds.'" Concord Village, Inc. v. Commissioner, supra at 154. Petitioner's bylaws and occupancy agreement further require that, if the board of directors determines that there is a surplus of revenues over "operating costs" as defined in the occupancy agreement, and if the Commissioner of Housing approves, then such surplus will be rebated to the shareholder-tenants in proportion to their rent payments for the year. However, as the testimony of petitioner's treasurer made clear, this provision was never utilized by petitioner and petitioner never made a cash distribution of a surplus to its tenant-shareholders. Finally, we disagree with respondent's argument that petitioner is not operating at cost due to the favorable interest rate and tax exemption which it enjoys under the Mitchell-Lama *334 Law and due to the cost efficiencies and interest earned by petitioner. In our view, a corporation is operating at cost and, thus, operating on a cooperative basis, if the members of the corporation receive all fruits and increases from the cooperative endeavor computed on the basis of whatever costs are incurred by the corporation, even if those costs are less than the cost incurred by a similar enterprise. For the foregoing reasons, we conclude that petitioner was operated on a cooperative basis during each of the years in issue and, accordingly, was subject to subchapter T. See Park Place, Inc. v. Commissioner, 57 T.C. at 779. Thus, we hold that petitioner is not subject to section 277 during any of the years in issue. Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. at 581. In view of the fact that we agree with petitioner's second argument, it is unnecessary to consider the other arguments made by petitioner. To reflect the foregoing, An order will be issued denying the motion for leave to file brief as Amicus Curiae and decision will be entered for petitioner. Footnotes
1. Petitioner's annual report to the Division for fiscal year ending Mar. 31, 1984, states that this amount is $ 5,516.↩